Roy Herrera (No. 032901)
Daniel A. Arellano (No. 032304)
Austin T. Marshall (No. 036582)
**HERRERA ARELLANO LLP**
530 East McDowell Road, Suite 107-150
Phoenix, Arizona 85004-1500
Telephone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
austin@ha-firm.com

Elisabeth Frost*
David Fox*
Harleen K. Gambhir*
Tina Meng*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
efrost@elias.law
dfox@elias.law
hgambhir@elias.law
tmeng@elias.law
mmcqueen@elias.law

* Application for *Pro Hac Vice* Forthcoming
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Alliance for Retired Americans; Voto Latino, | No. _____ |
| Plaintiffs, | |
| v. | |
| Clean Elections USA; Melody Jennings; Doe Defendants 1–10, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

Plaintiffs Arizona Alliance for Retired Americans and Voto Latino hereby allege as follows:

**INTRODUCTION**

1.     At least five times last week, supporters of Defendant Clean Elections USA ("CEUSA"), an organization founded by Defendant Melody Jennings, gathered at ballot drop boxes in Maricopa County with the express purpose of deterring voters—who Defendants irrationally fear are "ballot mules"—from depositing their ballots. And things are getting worse: on Friday, two of the drop box watchers were armed and wearing tactical gear, and again on Saturday, armed and masked individuals were gathered near drop boxes. Defendants' activities have already prompted three voter intimidation complaints that have been referred to the Department of Justice, as well as responses and investigations by the Maricopa County Sheriff's Department.

2.     Defendants boast that they are just getting started. Defendant Jennings says she has organized thousands of supporters, with more joining every day. Defendants marshal large groups—"you don't want to have less than eight people," Defendant Jennings has explained[1]—to prominently post themselves near ballot drop boxes where they conspicuously video-record and photograph voters as they return their ballots. Defendant Jennings admits that CEUSA's "goal is to be a deterrent."[2] To achieve that goal, Defendants engage in conduct that is clearly meant to intimidate. In addition to sending crowds to loom over voters, Defendant Jennings has threatened to use the images and video captured by those crowds to "dox" people; that is posting online a person's personal information, opening them up to harassment by the general public. "We can zoom right in we can get your face, so we've got you," Defendant Jennings boasted of the group's work.[3]

---

[1] *What's on your Mind: 9-01-22 What's On Your Mind Hour 1* at 30:25, WZFG The Flag (Sept. 1, 2022).

[2] *Dark to Light: Melody Jennings From Clean Elections USA* at 2:42, Radio Influence Digital Media, (July 18, 2022).

[3] *Steve Bannon's War Room: Episode 2231* at 31:45, (Oct. 17, 2022)

3.      Defendants assert that these vigilante groups are a response to "mules," a term arising from a debunked conspiracy theory in which a shadowy, sprawling political cabal collects or forges absentee ballots and deposits them in drop boxes. But such "mules" do not exist, and the people Defendants are intimidating are simply voters. As the Maricopa County Elections Department explained on Saturday: "Uniformed vigilantes outside Maricopa County's drop boxes are not increasing election integrity. Instead they are leading to voter intimidation complaints. . . . Don't dress in body armor to intimidate voters as they are legally returning their ballots."[4]

4.      Defendants have already achieved their goal of intimidating Arizona voters. Defendant Jennings has openly bragged about at least one incident in which a group of Arizona vigilantes "saw a couple of mules come up [to a drop box] and . . . they didn't stop; they turned around and went the other way."[5] This is a classic example of voter intimidation. A voter approached a drop box to deposit their ballot, saw a threatening group gathered nearby, and in response, fearfully retreated without casting a vote. As Defendant Jennings said of these intimidation tactics, "it's working."[6]

5.      Defendants' coordinated campaign of vigilante voter intimidation violates the Voting Rights Act of 1965 and the Ku Klux Klan Act of 1871. In the aftermath of previous voter suppression efforts in the Reconstruction and Civil Rights Eras, Congress responded forcefully by enacting laws that unequivocally prohibit voter intimidation. In the 1870s, in response to threats of political violence and harassment against former slaves and their white supporters by the newly formed Ku Klux Klan, Congress banned private conspiracies to intimidate or threaten voters. In the 1960s, in response to the

---

https://warroom.org/2022/10/17/episode-2231-farage-on-the-death-of-the-british-conservative-party-more-states-are-in-play-for-maga/ (last visited 10/23/2022).

[4] @MaricopaVote, Twitter (Oct. 22, 2022) https://twitter.com/maricopavote/status/1583976792062185472.

[5] The Nader Narrative, *Nader Narrative Interview with Melody Jennings*, YouTube (Sept. 1, 2022), https://www.youtube.com/watch?v=C1EFEjR6tlU (at 8:00).

[6] *Id.*

menacing of African Americans who sought their full rights at the ballot box, Congress prohibited any threats or intimidation against people engaged in the democratic process.

6.     Immediate relief is necessary. Voting is already underway, and there are only 15 days left until election day. Defendants' organized vigilante groups have already turned away voters. Under any circumstance, Defendants' conduct would be objectively intimidating. But, in the current charged political climate, Defendants' actions carry with them exacerbated threats. There is no guarantee that the crowds that Defendants have mobilized and are continuing to stoke will remain peaceful. But even a false accusation that a voter is a "mule" can have broad, irreversible consequences. In 2020, election workers who were wrongfully accused of misconduct faced unrelenting harassment, including death threats, with some relocating themselves and their families out of fears for their safety. Defendants' conduct—both at the drop box locations themselves, and beyond, as they threaten to publicize the names and faces of voters who they suspect to be bad actors—risks similarly unacceptable outcomes. Unless enjoined, Defendants will continue to bully and intimidate lawful Arizona voters—including through using armed presences—who are attempting to do nothing more than vote in accordance with Arizona law. Plaintiffs, their constituents and members, and untold numbers of Arizona voters will suffer irreparable harm if the right to vote is imperiled by the same forms of virulent harassment that federal law has prohibited since after the Civil War.

## PARTIES

7.     Plaintiff Arizona Alliance for Retired Americans, Inc. (the "Alliance") is a nonprofit corporation organized under section 501(c)(4) of the Internal Revenue Code. The Arizona Alliance's membership includes approximately 50,000 retirees, most of whom are over the age of 65, from public and private sector unions, community organizations, and individual activists in every county in Arizona. The Arizona Alliance is a chartered affiliate of the Alliance for Retired Americans, which is one of the country's leading grassroots senior organizations and engages in important political efforts to protect and preserve programs vital to the health and economic security of older

Americans.

8.     The Alliance's mission is to ensure social and economic justice and to protect the civil rights of retirees after a lifetime of work. Defendants' vigilante intimidation of voters using drop boxes threatens the Alliance's efforts to ensure its members have adequate access to the franchise.

9.     If Defendants' actions targeting drop boxes in Arizona continue, the Alliance will have to divert its limited resources to combat these harms, such as by shifting staff time and funds away from other projects to quelling members' anxieties about using drop boxes, to devising and executing plans to educate the Alliance's membership about how to safely navigate the voting process, and to finding other (more burdensome) alternatives for submitting mail ballots.

10.    The Alliance also brings this action on behalf of its members. Most of the Alliance's members are between 55 and 90 years of age and many have disabilities. Arizona is a state that relies heavily on vote-by-mail ballots, with almost 90% of the votes in the 2020 general election being early ballots, and many of the Alliance's members similarly vote using mail ballots in large numbers. The Alliance's members therefore also rely on access to drop boxes to return their ballots, and inability to easily and safely access drop boxes, especially when taking into account many members' individual circumstances such as age and physical abilities, has created additional hurdles that simply did not exist before. Moreover, many of the Alliance's members use drop boxes to ensure that their ballots are received in time to be counted, and their right to vote not subject to issues with mail delivery. Thus, the Alliance's members are particularly likely to be subject to Defendants' intimidation tactics, which are targeting voters using drop boxes to vote in the 2022 November elections.

11.    Plaintiff Voto Latino is a nonprofit corporation organized under section 501(c)(4) of the Internal Revenue Code. Voto Latino is dedicated to growing political engagement in historically underrepresented communities, specifically young and Latinx voters. Voto Latino has made, and will continue to make, expenditures to educate,

mobilize, and turn out voters in Arizona. Voto Latino employees and volunteers engage in voter registration drives and conduct email and social media advertising campaigns to remind voters—particularly Voto Latino's core constituency, young and Latino voters— to vote through get-out-the-vote efforts, including text banking and advertising campaigns, to encourage voters to vote, remind them to update their voter registrations, and inform them about available means of voting, such as early in-person voting or voting by mail, including via drop boxes. Voto Latino frequently engages with college students and new residents of Arizona during its voter education and mobilization efforts.

12.     If Defendants' voter intimidation efforts in Arizona continue, Voto Latino will need to divert resources from other mission-critical work to spending time educating its constituents about the new, hostile environment which voters must navigate just to return their validly voted ballot, to reduce the harm that Defendants' actions will otherwise inflict on Voto Latino's organizational goal of empowering Latinx voters.

13.     Defendant Clean Elections USA ("CEUSA") is an organization whose stated purpose is a commitment to election integrity to prevent fraudulent use of drop boxes for mail-in ballots. The organization is responsible for coordinating a network of thousands of individuals who intend to serve as vigilante drop box monitors across the country, including in Arizona. CEUSA has actively recruited individuals to participate in its campaign for drop box monitoring during early voting and for election day via websites, podcast and online show appearances, and social media posts, all of which are readily accessible in Arizona via the internet.

14.     On information and belief, CEUSA is an unincorporated association without formal legal status.

15.     Defendant Melody Jennings identifies herself as the founder of CEUSA and the organizer of a campaign known as the "Drop Box Initiative 2022," which has recruited and organized individuals in Arizona to go to ballot drop boxes and track, monitor, photograph, and video-record voters as they use drop boxes to return their ballots.

16.    Defendant Jennings uses the username "TrumperMel" on the social media platform Truth Social, where she has nearly 35,000 followers.

17.    On information and belief, Defendant Jennings is a resident of Oklahoma, and is acting in concert with others affiliated with CEUSA to coordinate the systematic network of monitors and monitoring activities.

18.    Doe Defendants 1 to 10 are individuals who have been recruited or encouraged by Defendants CEUSA and Jennings to go to drop boxes in Arizona to track, monitor, photograph, and video-record voters as they use drop boxes to return their ballots. They include but are not limited to the individuals pictured in the following photographs, along with all others who gathered at the drop box in Mesa, Arizona on October 17, 20, 21, and 22, and who gathered at the drop box in front of the Maricopa County Tabulation and Election Center on October 19, 2022:



*Figure 1: Image of Doe Defendants in tactical gear by Mesa, AZ drop boxes*



*Figure 2: Image of armed Doe Defendants by Mesa, AZ drop boxes*



*Figure 3: Image of Doe Defendants gathered to monitor drop boxes (redactions original)*



*Figure 4: Image of Doe Defendants gathered to monitor drop boxes*

19.     The Doe Defendants have assisted and acted in concert with CEUSA and Defendant Jennings in efforts to systematically monitor voter activity at drop boxes in Arizona through large, multi-person groups that situate themselves in the vicinity of the drop boxes. The identities and precise residences of all Doe Defendants are presently unknown to Plaintiffs and could not be ascertained prior to filing this Complaint. Plaintiffs will amend this Complaint to add the true names of the Doe Defendants when their identities are known.

20.     In social media posts and interviews, Defendant Jennings speaking on behalf of CEUSA has repeatedly claimed responsibility for the Doe Defendants and their actions, referring to the Doe Defendants as "our people," "my people," "our beautiful box watchers," and "us," including in the following post on October 22:

Figure 4: Defendant Jennings post about armed Doe Defendants wearing tactical gear

**JURISDICTION AND VENUE**

21.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, specifically Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), and Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).

22.    Personal jurisdiction exists over Defendants because they have caused and will continue to cause harm or tortious injury by an act in this State or directed to this State. *See* Ariz. R. Civ. P. 4.2; *Meyers v. Hamilton Corp.*, 143 Ariz. 249, 251–52 (1984).

23.    Specifically, Defendant Jennings, on her own behalf and on behalf of CEUSA, has repeatedly recruited and encouraged individuals in Arizona, including the Doe Defendants, to go to particular drop boxes in Arizona to monitor them, and thereby to intimidate and attempt to intimidate voters in Arizona in violation of federal law. And CEUSA has further acted in Arizona via the actions of the Doe Defendants, who have engaged in unlawful voter intimidation in Arizona on CEUSA's and Defendant Jennings' behalf.

24.    The Alliance has standing in this action because part of its mission is

ensuring their members have access to the franchise and can cast their ballot, including at drop boxes, without fear of danger, physical or otherwise. Both the Alliance as an organization and its members are threatened with immediate and irreparable injury if the vigilante voter intimidation campaign by Defendants succeeds in disrupting the peaceful operations of the election by means of unlawful voter intimidation and unlawful conspiracy. Thus, the Alliance has standing on behalf of itself and its members.

25.     Voto Latino also has standing because Defendants' actions to intimidate voters will cause the organization to divert resources away from traditional activities of mobilizing and turning out voters in Arizona towards having to educate voters about how to navigate the intimidating circumstances around drop box usage in Arizona.

26.     Venue is proper in this district under 28 U.S.C. § 1391(e) because significant events giving rise to this action occurred in this district, namely, Defendants' unlawful actions at drop boxes in Arizona.

## FACTUAL ALLEGATIONS

**A.     Defendant Jennings formed CEUSA to intimidate voters.**

27.     The inspiration for CEUSA arose from the stew of disproven conspiracy theories about the 2020 election. On April 17, 2022, Defendant Jennings learned of 2000 Mules,[7] a propaganda film produced by right-wing commentator Dinesh D'Souza. Based primarily on an analysis of anonymized cellphone location data, the film imagines a shadowy, underground network of "ballot mules" who collected fraudulent absentee ballots and deposited them, *en masse*, in drop boxes across several key states during the 2020 election.

28.     The claims in 2000 Mules have been roundly debunked. The Associated Press explained that the film was based on "false assumptions" about cellphone tracking data and engaged in "pure speculation."[8] Questioned about the film under oath, Attorney

---

[7] Gregg Phillips, *Patriot Games: Ground Games* at 6:00–7:50.

[8] Ali Swenson, *Fact Focus: Gaping holes in the claim of 2k ballot 'mules'*, Associated Press   (May   3,   2022),   https://apnews.com/article/2022-midterm-elections-covid-

General Bill Barr laughed and explained that the cellphone data is "singularly unimpressive" and that the premise that it shows the existence of "ballot mules" was "just indefensible." When there are millions of cell phones in a city, Barr explained, there will almost "by definition" be some that repeatedly pass by particular places over any given time period.[9]

29.    Defendant Jennings, however, was convinced even before she saw the film. After seeing just the *previews* for 2000 Mules, she decided that "[w]e're going to take this into our own hands,"[10] formed Defendant CEUSA, and initiated a campaign she has called the #Dropboxinitiative2022, which recruits volunteers and then coordinates large groups to assemble at drop boxes and proceed to film and photograph the box and harass voters that try to deposit their ballots under the pretext of preventing "mules" from "stuff[ing] drop boxes."[11] *See infra Figure 6.*

30.    Defendant Jennings has repeatedly and openly said that the purpose behind CEUSA and the #Dropboxinitiative2022 is to discourage the use of drop boxes. She has emphasized that participants should gather in large groups because they are more intimidating. As Jennings has explained, "you're not really a deterrent with two or three people. Ten is going to be a dynamic deterrent. It's harder to say, 'yeah, I'm fine walking up in that crowd.'"[12]

---

technology-health-arizona-e1b49d2311bf900f44fa5c6dac406762.

[9] @dcexaminer, Twitter (Jun. 13, 2022), https://twitter.com/dcexaminer/status/1536423348141441031.

[10] *Patriot Games: Ground Games* at 12:15 (Defendant Jennings stating "[w]e're going to take this into our own hands").

[11] *Id.* (Jennings describing the effort as "put[ting] ten people—ten patriots—around boxes and guard the boxes."); *see also What's On Your Mind: 9-01-22 What's on your Mind Hour 1*, WZFG The Flag (Sept. 1, 2022), https://www.am1100theflag.com/show-episodes/53269-9-01-22-whats-on-your-mind-hour-1; The Nader Narrative, *Nader Narrative Interview with Melody Jennings*, YouTube (Sept. 1, 2022), https://www.youtube.com/watch?v=C1EFEjR6tlU.

[12] The Flag podcast at 30:20; @TrumperMel, Truth (Sept. 23, 2022), https://truthsocial.com/@TrumperMel/posts/109047737221831005.

31.     This notion of "deterrence" appears across several of Defendant Jennings' public posts encouraging drop box monitoring. For instance, on August 11, Defendant Jennings posted that groups to monitor drop boxes should be "[n]o less than 8 people" because "[j]ust your presence alone & the mule knowing they will be caught on ur [sic] multiple cameras *is enough deterrent to make them shrink back into the darkness.* Be aware they will head to another box, so you might as well go ahead &recruit more folks to be at those as well." (emphasis added).



*Figure 5: Defendant Jennings post from Aug. 11, 2022*

32.    Similarly, on September 23, Defendant Jennings called for monitors to gather "10 people in grounds around every drop box! Not 2 people. That's not a deterrent":



*Figure 6: Defendant Jennings post from Sept. 23, 2022*

33.     The purpose of recruiting a network of large groups deployed across Arizona at drop boxes is clear—to prevent voters from approaching drop boxes and using those tools to vote. And that deterrent effect is made even stronger where Defendants engage in drop box monitoring with the intent of signaling to voters that their personal identity and information could be publicly disclosed and thus the target of public harassment. In other words, voters would decide not to use drop boxes because they were being monitored by Defendants and because "these people don't want to be doxed."[13]

34.     To be sure, Defendants say that they are just trying to deter "ballot mules." But "ballot mules" are an invention of a debunked propaganda film; they do not exist. The people that Defendants are actually seeking to intimidate to prevent them from using ballot drop boxes are simply voters.

35.     Defendants' threat to publicly disclose the identities of voters who use drop boxes, and to falsely accuse them of being "mules," is extraordinarily dangerous in the current political environment, where angry individuals have repeatedly threatened to kill election workers and party officials in Arizona and elsewhere. Just weeks ago, an Iowa man was arrested for sending such death threats to election officials in Maricopa County.[14] And as explained below, Defendants themselves have promoted a group, Ben Sent Us, that has sent threatening communications to Democratic Party officials in Arizona. *See infra* ¶¶ 55-56.

36.     Moreover, Defendants' efforts to suppress the use of drop boxes do not stop with passive monitoring. Defendant Jennings has described building a system to allow CEUSA volunteers to capture high quality video and pictures and "immediately upload" those images to a data center in real time, where it could be shared with local sheriffs[15]

---

[13] *Patriot Games: Ground Games* at 13:27 and 18:50.

[14] U.S. Dep't of Justice, *Man Arrested for Making Threats to Maricopa County Election Official and to Official with Office of Arizona Attorney General* (Oct. 6, 2022), https://www.justice.gov/opa/pr/man-arrested-making-threats-maricopa-county-election-official-and-official-office-arizona.

[15] *Patriot Games: Ground Games* at 19:10.

through ProtectAmerica.vote,[16] a website where she has recruited sheriffs sympathetic to election fraud conspiracy theories. In a September 1 interview, Defendant Jennings also referred to reporting voters suspected of being "ballot mules" to "constitutional sheriffs" for an immediate response.[17]

37.     Consistent with this, Defendant Jennings has suggested through her posts on social media that there is more to Defendants' plan than mere observation, assuring a questioner who wanted to know whether "films and info" would be "given immediately to the sheriffs in order to pay the perpetrator a visit," simply for using a drop box to vote, that she "would love to tell you all the sauce" but that she did not "think that's wise to do in an open forum":



*Figure 7: Defendant Jennings response to post by user @jdanelle*

**B.     Drop boxes are commonly used to return ballots in Arizona.**

38.     Voters in Arizona mostly vote using early vote-by-mail ballots. Most recently, during the 2020 general election, approximately 89% of all ballots cast in the

---

[16] ProtectAmerica.vote, https://protectamerica.vote/ (last visited Oct. 24, 2022).
[17] The Nader Narrative, *Nader Interview with Melody Jennings*, YouTube (Sept. 1, 2022), https://www.youtube.com/watch?v=C1EFEjR6tlU (at 13:30).

state were early ballots, and 91% of the ballots cast in Maricopa County were early ballots.[18]

39.     After voters have received their early ballot in the mail, they have various options for how to return that ballot. One of the most common options is drop boxes. For instance, Maricopa County has the highest number of drop boxes in the state and 34% of voters used drop boxes the 2020 general election, and in Yavapai County, the county with the second-most number of drop boxes in Arizona, 51% of voters used drop boxes for the 2022 primary elections, and 59% of voters used drop boxes for the 2020 general election.[19]

40.     Drop boxes across Arizona are also highly secure—they must be located in secure locations, such as inside or in front of government buildings, and county election officials must comply with a series of detailed procedures designed to prevent tampering or access to the ballots by unauthorized individuals based on whether the drop boxes are staffed or not.[20] Additionally, drop boxes are often already under video surveillance, including in Maricopa County.[21]

---

[18]     *Vote by Mail*, Arizona Citizens Clean Elections Commission, https://www.azcleanelections.gov/how-to-vote/early-voting/vote-by-mail; *November General Election Canvass*, Maricopa County Elections Department 3 (Nov. 3, 2020), https://recorder.maricopa.gov/pdf/11-03-2020-0%20Canvass%20BOS%20SUMMARY%20NOV2020-two-sided%20print.pdf.

[19]     Rachel Leingang, *Ballot Drop Boxes Remain Popular, Despite Attacks and Misinformation*, AZ Mirror (Sept. 23, 2022), https://www.azmirror.com/2022/09/23/ballot-drop-boxes-remain-popular-despite-attacks-and-misinformation/; Jen Fifield, *This Republican Bastion of Arizona Loves Ballot Drop Boxes, The Far Right's Latest Target*, Votebeat (Aug. 12, 2022), https://arizona.votebeat.org/2022/6/3/23153797/ballot-drop-boxes-yavapai-county-2000-mules.

[20]     Sec'y Katie Hobbs, 2019 Elections Procedures Manual 60–62 (2019), https://azsos.gov/sites/default/files/ 2019_ELECTIONS_PROCEDURES_MANUAL_APPROVED.pdf; A.R.S. § 16-452(C) (Elections Procedures Manual carry the force of law).

[21]     *Live Video Feeds*, Maricopa County, https://recorder.maricopa.gov/elections/electionlivevideo/ (last visited Oct. 23, 2022); Rachel Leingang, *Early voters in Arizona midterms report harassment by poll watchers* (Oct. 20, 2022), https://www.theguardian.com/us-news/2022/oct/20/arizona-early-voters-harassment-drop-box-monitors.

41.     One of the main benefits of returning ballots in drop boxes is that they are much more reliable than returning ballots by mail. During the 2022 primary election, more than 3,000 Maricopa County voters had their ballots rejected when they were delivered too late to be counted.[22]

**C.     Defendants are intimidating Arizona voters at drop boxes.**

42.     Early voting began in Arizona on October 12, 2022.

43.     Defendants, who claim to have a network of 1,500 volunteers across the country, with an unspecified number in Arizona,[23] quickly mobilized and converted their plan into action.

44.     Individuals identifying themselves as affiliated with CEUSA began setting up their large-group operations in plain view of voters using the drop box at various ballot drop boxes.

45.     CEUSA's presence has led to repeated complaints of voter intimidation. On October 17, 2022, a voter sent a complaint to the Arizona Secretary of State reporting that a group of individuals were filming and photographing voters as they approached the drop box outside of the Maricopa County's Mesa Juvenile Court. These drop box monitors also accused these voters of being "a mule." These monitors also took photographs of the voters' license plate, of the voters, and followed the voters into the parking lot all while continuing to film.

---

[22]  Maricopa County, *August Primary Election Canvass* 144 (Aug. 2, 2022), https://elections.maricopa.gov/asset/jcr:b3aa9d0b-750e-40ec-9f39-f4b238767f59/08-02-2022-0%20Canvass%20COMPLETE%20AUG2022.pdf (last visited Oct. 23, 2022).

[23]  *Patriot Games: Ground Games*, at 8:00.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

-----Original Message-----
From: webmaster@azsos.gov <webmaster@azsos.gov>
Sent: Monday, October 17, 2022 7:29 PM
To: Christine Dyster < ███████████ >
Subject: Webform: Voting Incident - -240

CAUTION: The following message contains information provided by an anonymous user
through an online webform. Please treat the below message with caution, avoid clicking
links, downloading attachments, or replying with personal information.
Submitted values are:

==Incident==
    Date of incident: Mon, 10/17/2022
    Approximate time of the incident: 6:40 pm
    County where incident occurred: Maricopa
    Polling location where incident occurred: Mesa juvenile court
    drop box
    Describe the incident: There's a group of people hanging out
    near the ballot dropbox filming and photographing my wife and I
    as we  approached the dropbox and accusing us of being a mule.
    They took  a photographs of our license plate and of us and then
    followed us  out the parking lot in  one of their cars continuing
    to film.
    Were you able to report this incident to the poll workers or
    county officials?
    Current status of the incident: Ongoing
    Files: No, I don't have any additional information.

17
18

*Figure 8: Oct. 17, 2022 voter complaint (obtained through Oct. 21, 2022 Public Records Request)*

19
20
21
22
23
24
25
26
27
28

46.     This incident can be traced directly to CEUSA, where a post from Defendant Jennings shows an image of the voter who, based on publicly release video footage, appears to be the harassed voter, and other posts reference this Mesa drop box as a direct target of drop box monitoring.



*Figure 9: Defendant Jennings post with image of voter at drop box*



DEVELOPING: @abc15 has obtained the security footage of alleged voter intimidation at Mesa drop box. Full video is 20 minutes long, we have edited it and blurred the voter. There's no audio on original video, but voter claims he was photographed and accused of being a mule.



8:56 PM · Oct 20, 2022 · Twitter Web App

*Figure 10: Post with video footage of voter who filed a voter complaint*

1
2
3
4
5
6
7
8
9
10
11
12



13

*Figure 11: Defendant Jennings post regarding targeted drop box locations*

14      47.      In fact, after initially denying responsibility, Defendant Jennings admitted

15  in an interview that Defendants' members and supporters were present at the Mesa drop

16  box on October 17 and saw, photographed, and recorded the voter in question.[24]

17      48.      On October 19, 2022, a second report was made regarding a drop box in

18  Phoenix where a voter described "[c]amo clad people" photographing him and his car as

19  he submitted his ballot in a Phoenix drop box. *See infra* Figure 12.

20      49.      The October 19 complaint included photographs of the individuals in

21  question, who exactly match two of the Doe Defendants who Defendant Jennings

22  referred to as "[o]ur beautiful box watchers" in Maricopa County that same day:

23
24
25
26

27  ─────────────────

[24] Bannons War Room, *Matriano Stands Up for Pennsylvania Families,* rumble (Oct. 21, 2022), https://rumble.com/v1p2xof-episode-2243-mastriano-stands-up-for-pennsylvania-families.html (at 42:50).

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**From:** ▇▇▇▇▇▇ via Arizona Secretary of State <webmaster@azsos.gov>
**Sent:** Wednesday, October 19, 2022 7:03 PM
**To:** Jason Chavez ▇▇▇▇▇▇▇▇▇▇ >
**Subject:** Webform: Voting Incident - -241

CAUTION: The following message contains information provided by an anonymous user through an online webform. Please treat the below message with caution, avoid clicking links, downloading attachments, or replying with personal information.
Submitted values are:

==Incident==
    Date of incident: Wed, 10/19/2022
    Approximate time of the incident: 2:30 pm
    County where incident occurred: Maricopa
    Polling location where incident occurred: 501 S 3rd Ave, Phoenix AZ
    Describe the incident: Camo clad people taking pictures of me, my license plate as I dropped our mail in ballots in the box.  When I approached them asking names, group they're with, they wouldn't give anything.  They asked why I wanted to know, well it's because it's a personal attack.   They basically said they're taking pictures looking for some fantasy BS on the voting citizenry.  Inside record office the ladies said it was worse last year when they all had guns!!  Some workers had quit due these conspiracy idiots.  I don't appreciate the harassment.  I'm curious if they're staying 75 ft away too
    Were you able to report this incident to the poll workers or county officials? Yes
    Current status of the incident: Ongoing
    Files: Yes, I'm emailing info to elections@azsos.gov.

24
25
26
27
28

*Figure 12: Oct. 19, 2022 voter complaint (obtained through Oct. 21, 2022 Public Record Request)*



*Figure 13: Images accompanying Oct. 19, 2022 voter complaint (obtained through Oct. 21, 2022 Public Record Request)*



*Figure 14: Defendant Jennings post about "our" drop box watchers*

50.     Those same individuals told a reporter that same day that they were with CEUSA, and they otherwise declined to speak to the reporter, saying that they are "not supposed to be having a discussion with anyone about anything" and that they would "like to talk to [Clean Elections USA] before" speaking further to her.[25]

51.     On October 20, 2022, another complaint of intimidation was made to the Secretary of State. Two voters, who were married senior citizens, were using the drop box outside of the Mesa Superior Court's Juvenile Department and reported another independent incident where the voters found themselves and their license plate being photographed by five or six men in their 20s or 30s. The behavior of the monitors in this incident match that of the monitors from the October 17 voter complaint.

-----Original Message-----
From: webmaster@azsos.gov <webmaster@azsos.gov>
Sent: Thursday, October 20, 2022 1:47 PM
To: Christine Dyster <███████████████>
Subject: Webform: Voting Incident - -243

CAUTION: The following message contains information provided by an anonymous user through an online webform. Please treat the below message with caution, avoid clicking links, downloading attachments, or replying with personal information.
Submitted values are:

==Incident==
    Date of incident: Thu, 10/20/2022
    Approximate time of the incident: 12:30 pm
    County where incident occurred: Maricopa
    Polling location where incident occurred: Mesa Juvenile Court
    Describe the incident:
    My wife and I (70 yrs old) parked our car to each individually
    drop our ballots in the drop boxes located outside the Juvenile
    Court, there was a group of 5 or 6 20-30 yr old men standing in
    the parking lot. We put our ballots in the drop box and walked
    back to our car. As we were getting up to our car, two
    individuals took pictures of our license plate and our car. I got
    out and asked what they were doing. They claimed they were taking
    pictures for "election security" and I took pictures of them to
    report them to the DOJ for voter intimation and harassments. As
    we were pulling out, the continued to film my wife, myself and
    our car.

*Figure 15: Oct. 20, 2022 voter complaint (obtained through Oct. 21, 2022 Public Record Request)*

[25] @NicoleSGrigg, Twitter (Oct. 19, 2022), https://twitter.com/NicoleSGrigg/status/ 1582904476393820160.

52. Defendants responded to these complaints by escalating their tactics. Friday evening, October 21, the Maricopa County Sherriff's responded to complaints about two individuals stationed around the Mesa drop box in the evening with full disguises, tactical gear, and magazine clips.[26] The Maricopa County Sheriff's Office confirmed that both individuals were armed.



*Figure 16: Post about armed individuals at drop boxes in Mesa, Arizona*

53. Defendant Jennings responded to this incident by reposting a social media post claiming that "by the looks of this video, these people are not doing ANYTHING

---

[26] @NicoleSGrigg, Twitter (Oct. 21, 2022), https://twitter.com/NicoleSGrigg/status/1583674573874032640?s=20&t=Rql372xHdnQDdUg_XksrsA.

illegal":



*Figure 17: Defendant Jennings re-post about armed individuals at Mesa drop box*

54.    Defendant Jennings then directly confirmed that the armed individuals, who she referred to as "two of our people," were affiliated with Defendants:

*Figure 18: Defendant Jennings post referring to armed Doe Defendants as "our people"*

55.     On Saturday evening, October 22, armed and masked individuals again gathered at the drop box in Mesa, prompting the Maricopa County Sheriff's Office to again deploy to the scene.

56.     Defendants have also publicly admitted to other incidents that appear to have gone unreported to state election officials. For instance, Defendant Jennings has reported instances in which Arizona voters retreated from drop boxes after encountering the groups she had coordinated. Defendants Jennings further reported that during the primary election, one group of agents in Arizona saw people approach a drop box and before casting a ballot "they turned around and went the other way."[27] Defendant Jennings described the people who approached the ballot box as "mules" but offered no evidence that they were anything other than lawful Arizona voters.

57.     And Defendants' actions do not stop at intimidation at drop boxes. Defendant Jennings has also promoted efforts by Ben Sent Us, an anonymous group whose name appeared on threatening flyers posted in post offices and sent to local members of the Democratic party. The flyer described a plan virtually identical to that described by Defendants, promising to use "video and pictures of possible ballot, voting

---

[27] The Nader Narrative, *Nader Interview with Melody Jennings*, YouTube (Sept. 1, 2022), https://www.youtube.com/watch?v=C1EFEjR6tlU (at 8:00).

28

and dropbox fraud," to dox its targets, and to share the "evidence" of fraud with local sheriffs. *See infra* Figure 20.

58.     Defendant Jennings reposted a social media post publicizing these efforts, and the flyer itself contained a pair of leering eyes which are identical to those used by Defendant Jennings in one of her posts.



*Figure 19: Ben Sent Us post Reposted By Defendant Jennings*

*Figure 20: Ben Sent Us flyers sent to "Democratic party members"*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**TrumperMel** ✅
@TrumperMel · Oct 7

Washington, California, Nevada, Illinois, Virginia, Michigan, New York, Arizona, Ohio, Colorado, New Jersey, all NE above NY, are you watching a drop box? Get eyes on. Take pictures/video. 8-10 ppl per box. Tailgate party, Bible study, whatever. Shine your headlights on the box.

All states, park at front & back entrances of early voting buildings. Record who goes in & out. Watch for return voters & for someone entering buildings after business hours.
Every patriot, EYES ON!
Yes, you!

💬 8    🔁 86    ♡ 131    ⬆    ···

*Figure 21: Defendant Jennings post regarding "eyes on"*

**D.    Federal law prohibits the type of voter intimidation vigilantism perpetrated by Defendants.**

59.    Defendants' tactic of gathering in groups at polling places to intimidate voters is nothing new. Congress long ago enacted two broad statutes to specifically prevent the types of voter intimidation affecting Arizona voters today.

60.    The Ku Klux Klan Act of 1871 (the "Klan Act") was the last of the Enforcement Acts—legislation passed during Reconstruction to protect the suffrage rights of newly freed slaves, including by protecting them and their supporters from violence and harassment. President Grant requested the legislation in order to empower him to stamp out the first generation of the Ku Klux Klan, which Congress granted within a month of the request.

61.    While the Klan Act is most well known for making state officials liable in federal court if they deprive anyone of their civil rights or the equal protection of the law, *see* 42 U.S.C. § 1983, it also prohibits private actors from engaging in conspiracies to intimidate voters. *See* 42 U.S.C. § 1985(3).

62.    Section 1985(3) of the Klan Act provides for damages and equitable relief "if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of . . . an elector for President or Vice President, or as a Member of Congress of the United States . . . ." *Id*. The Act further provides that an action will lie against the conspirators so long as "one or more persons engaged" in the conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy." *Id.* As the Supreme Court made clear in *Ex parte Yarbrough*, 110 U.S. 651 (1884), the constitutional basis for this broad provision—whose text requires no showing of racial intent or animus, only a conspiracy to intimidate voters—is the Constitution's Elections Clause.

63.    Congress later reaffirmed its commitment to outlawing voter intimidation in the Civil Rights Act of 1957. That Act, now codified at 52 U.S.C. § 10101(b),

prohibited any person from intimidating voters, or attempting to intimidate voters, "for the purpose of interfering with [the right to vote]." In the years following the Civil Rights Act, courts interpreted that provision to require purposeful intent to intimidate voters and to discriminate on the basis of race. *See, e.g.*, *United States v. McLeod*, 385 F.2d 734, 750 (5th Cir. 1967) (holding plaintiffs failed to prove voter intimidation under the Civil Rights Act because there was a good-faith, "legitimate" motive for the Defendants' actions).

64.     Nearly a century after enacting the Klan Act, Congress again invoked its broad Elections Clause power to protect the franchise in 1965. Responding to numerous instances of intimidation in both elections and registration efforts in the Jim Crow South, including the killing of black and white activists seeking to register African Americans to vote, Congress passed Section 11(b) of the Voting Rights Act, which authorizes private suits against private actors, even in the absence of any action by a state or state official.

65.     The text of § 11(b) reads: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote . . . ." 52 U.S.C. § 10307(b).

66.     In enacting this provision, Congress recognized that voter intimidation would be difficult to prove under § 10101(b) of the Civil Rights Act of 1957, and thus the plain text of Section 11(b) removed the word "purpose," thus eliminating the requirement that plaintiffs demonstrate a specific purpose to intimidate voters to bring a successful cause of action for voter intimidation.

67.     Indeed, in testimony before the Senate Judiciary Committee, then-Attorney General Katzenbach explained that § 11(b) "represents a substantial improvement over [the Civil Rights Act]," which now prohibits voting intimidation. Voting Rights, Part 1: *Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965). As Katzenbach further explained, "under [the VRA] no subjective 'purpose' need be shown,

in either civil or criminal proceedings, in order to prove intimidation . . . Rather, defendants would be deemed to intend the natural consequences of their acts." *Id.* The House Report went on to adopt this reasoning, explaining: "The prohibited acts of intimidation need not be racially motivated; indeed, unlike [the Civil Rights Act] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown." H. Rep. No. 89-439 at 30, 89th Congress, 1st Sess. 32 (1965).

68.     As a result, although Section 11(b) targets actions that make voters "timid or fearful," or that "inspire or affect fear," or "threaten" through "promise [of] punishment, reprisal, or other distress," *Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl II*"), 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) (quoting *United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994)), Plaintiffs need not show that Defendants have any specific, purposeful intent to intimidate voters (against voters of color or otherwise) to demonstrate a violation of § 11(b). Rather, the legal test is whether Defendants' conduct is objectively intimidating or threatening to voters. *See also League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3–4 (E.D. Va. Aug. 13, 2018) (analyzing the text of Section 11(b) against similar statutes that explicitly require a showing of intent); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 485 (S.D.N.Y. 2020) ("*Wohl I*"), *reconsideration denied*, No. 20 CIV. 8668 (VM), 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020) (finding that the plain language of Section 11(b) does not contain an intent requirement); Order at 23, *Fair Fight v. True the Vote*, No. 2:20-cv-00302-SCJ (N.D. Ga. Jan. 1, 2021), ECF No. 29 (finding Section 11(b) does not have an intent requirement, and thus "a plaintiff need not show animus or an intent to harass or intimidate in order to succeed on a Section 11(b) claim").

**E.     Defendants' actions clearly violate federal laws prohibiting voter intimidation.**

69.     Defendants' actions violate Section 11(b) several times over. The Doe Defendants, monitoring drop boxes wearing full tactical gear and bearing arms, are

intimidating voters by their presence through a clear threat of physical violence. Such a "presence of armed 'guards' at [voting locations] with no connection to state government is certainly likely to intimidate voters." *Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020); *cf. United States v. Clark*, 249 F. Supp. 720, 725 (S.D. Ala. 1965) (the presence of groups of deputies and "possemen" stationed around areas within the community were found to be intimidating to voters).

70.     Beyond physical threats to a voter's life, "[c]onduct that 'put[s] [an individual] in fear of harassment and interference with their right to vote'" is also "sufficient to support [a] § 11(b) claim.'" *Wohl II*, 512 F. Supp. 3d at 509 (citation omitted). For instance, the encouragement of voters to monitor voting locations and related voting activities, as Defendant Jennings has done repeatedly and across various platforms, has been previously enjoined as voter intimidation under Section 11(b). *See Ohio Democratic Party v. Ohio Republican Party*, No. 16-CV-02645, 2016 WL 6542486, at *2 (N.D. Ohio Nov. 4, 2016) (granting injunction against Defendants who encouraged rally attendees to monitor and "aggressively patrol polling places"), *stay granted*, No. 16-4268, 2016 WL 6608962 (6th Cir. Nov. 6, 2016).

71.     Similarly, accusing voters of criminal conduct—as Defendant and their agents have when accusing voter of being "mules"—or suggesting that they are otherwise ineligible to vote also can also constitute voter intimidation under Section 11(b). *Pub. Int. Legal Found.*, 2018 WL 3848404, at *4.

72.     The same is true of "actions or communications that inspire fear of . . . privacy violations, and even surveillance," all of which "constitute unlawful threats or intimidation under the statute." *Wohl II*, 512 F. Supp. 3d. at 509. Defendants have done far more than merely inspire a fear of surveillance—they conspicuously display their surveillance tools to ensure that voters know voters' ballot submission activities are not private. Similarly, Defendants' intimidation strategy of threatening, through their presence, the doxing of voters, which would reveal personal information to the public and subject voters to harassment, constitutes intimidation under Section 11(b). *Wohl I*, 498 F.

1  Supp. 3d at 482-84.

2        73.    Following voters around, recording information associated with the identity

3  of the voter, verbalizing disruptive noises and sounds around the voter, and threatening

4  prosecution for voting all constitute violations of Section 11(b). *See, e.g.*, *Ohio*

5  *Democratic Party*, 2016 WL 6542486, at *2 (enjoining defendants from "[f]ollowing,

6  taking photos of, or otherwise recording voters or prospective voters, those assisting

7  voters or prospective voters, or their vehicles at or around a polling place, or training,

8  organizing, or directing others to do the same"); *see also DNC v. RNC*, 671 F. Supp. 2d

9  575, 622–23 (D.N.J. 2009) (modifying consent decree entered to resolve Section 11(b)

10  claims but maintaining provision that RNC could not "videotape, photograph, or

11  otherwise make visual records of voters or their vehicles").

12        74.    Here, voters have complained about Defendants' harassing voters by

13  calling them "mules," have reported being followed, and report having their license plate

14  photographed. These experiences mirror those of the voters who successfully obtained a

15  Temporary Restraining Order in *Daschle* on the basis of voter intimidation. *See also Ohio*

16  *Democratic Party*, 2016 WL 6542486, at *2 ("[i]nterrogating, admonishing, interfering

17  with, or verbally harassing voters or prospective voters," "gathering or loitering . . .

18  without the intention to vote," and "[f]ollowing, taking photos of, or otherwise recording

19  voters or prospective voters . . . or their vehicles" as actions that violate Section 11(b) and

20  thus were enjoined).

21        75.    And even as to those persons who do not directly participate in those

22  activities, the Klan Act makes it unlawful to conspire with others to promote, organize,

23  and facilitate those efforts, and here Defendants' broad network of volunteers to

24  monitor—and intimidate—voters across Arizona who use drop boxes to return their

25  ballots are directly probative of such an illegal conspiracy to deter voting in Arizona.

26  <center>**COUNT ONE**</center>

27  <center>**Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b)**</center>

28        76.    Plaintiffs incorporate by reference the allegations of the preceding

paragraphs.

77.   Defendants, through coordinated efforts, have developed a network of volunteers and resources to cause individuals to gather in large groups at drop boxes to try to deter "mules," who are merely voters, from using them. In some cases, Defendants have escalated their efforts by encouraging individuals to show up armed, masked, and wearing tactical gear.

78.   All of these activities constitute a violation of Section 11(b) of the Voting Rights Act, which prohibits all actual or attempted "intimidation," "threats," or "coercion" against a person, either "for voting or attempting to vote." 52 U.S.C. § 10307(b).

79.   Absent declaratory and injunctive relief, voters will be subjected to intimidation, threats, and perhaps even force or physical harm at the hands of vigilante drop box watchers, and many may suffer unwarranted delays or denials of their right to cast a ballot in the approaching elections.

80.   Plaintiffs are entitled to a declaration that Defendants have violated Section 11(b) of the Voting Rights Act, and a preliminary and permanent injunction prohibiting further violations.

**COUNT TWO**

**Ku Klux Klan Act, 42 U.S.C. § 1985(3)**

81.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

82.   Defendants, including Defendant Jennings, have repeatedly called on her co-conspirators to descend on drop boxes across the state through self-proclaimed efforts to deter voting.

83.   These co-conspirators have engaged in online organizing and mobilization efforts to support their plan, including using Truth Social and the hashtag #DropboxInitiative2022, as well as publicizing efforts through podcast and video appearances.

84.    These organized efforts violate the Ku Klux Klan Act, which prohibits "conspir[ing] to prevent, by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner," and provides a cause of action against any of the conspirators to anyone "deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1985(3).

85.    Absent declaratory and injunctive relief, voters will be subjected to intimidation, threats, and perhaps even force or physical harm at the hands of vigilante drop box watchers, and many may suffer unwarranted delays or denials of their right to cast a ballot in the approaching elections.

86.    Plaintiffs are entitled to a declaration that the Defendants and their affiliates have violated the Ku Klux Klan Act through their conspiracy to intimidate voters, an injunction enjoining Defendants and others from any further activity to advance their conspiracy, and actual and nominal damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and:

A.   Declare that Defendants have violated § 11(b) of the Voting Rights Act.

B.   Declare that Defendants have violated § 1985(3) of the Ku Klux Klan Act.

C.   Temporarily and permanently enjoin the Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from:

i.   Gathering within sight of drop boxes;

ii.  Following, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles at or around a drop box;

iii. Training, organizing, or directing others to do the same.

D.   Award nominal, compensatory and statutory damages in an amount to be determined.

E. Award punitive damages in an amount to be determined.

F. Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

G. Grant such other and further relief as the Court deems just and proper.

Dated: October 24, 2022

Respectfully submitted,

/s/ Daniel A. Arellano
Roy Herrera (No. 032901)
Daniel A. Arellano (No. 032304)
Austin T. Marshall (No. 036582)
**HERRERA ARELLANO LLP**
530 East McDowell Road, Suite 107-150
Phoenix, Arizona 85004-1500

Elisabeth Frost*
David Fox*
Harleen K. Gambhir*
Tina Meng*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498

* Application for *Pro Hac Vice*
Forthcoming

*Counsel for Plaintiffs*