Roy Herrera (No. 032901)
Daniel A. Arellano (No. 032304)
Austin T. Marshall (No. 036582)
**HERRERA ARELLANO LLP**
530 East McDowell Road, Suite 107-150
Phoenix, Arizona 85004-1500
Telephone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
austin@ha-firm.com

Elisabeth Frost*
David Fox*
Harleen K. Gambhir*
Tina Meng*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
efrost@elias.law
dfox@elias.law
hgambhir@elias.law
tmeng@elias.law
mmcqueen@elias.law

* Application for *Pro Hac Vice* Forthcoming
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Arizona Alliance for Retired Americans; Voto Latino, <br><br> Plaintiffs, <br><br> v. <br><br> Clean Elections USA; Melody Jennings; Doe Defendants 1-10, <br><br> Defendants. | No. _____ <br><br><br><br><br> **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD .......................................................................................... 7

I.   Plaintiffs are likely to succeed on the merits of their claims ................... 8

   A.  Plaintiffs have standing ................................................................ 8

   B.  Defendants have violated Section 11(b) of the Voting Rights Act ................... 9

   C.  Defendants have violated the Support or Advocacy clause of the Klan Act. .. 12

II.   Plaintiffs will suffer irreparable harm in the absence of relief............................. 15

III.  The balance of the equities and the public interest favor Plaintiffs ...................... 16

CONCLUSION ................................................................................................. 17

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Ariz. Dem. Party v. Ariz. Rep. Party*,

5

No. CV-16-03752-PHX-JJT, 2016 WL 8669978

6

(D. Ariz. Nov. 4, 2016) .......................................................................... 9, 11, 15, 16

7

*Bretz v. Kelman*,

8

773 F.2d 1026 (9th Cir. 1985) (en banc) .................................................... 12

9

*Burson v. Freeman*,

10

504 U.S. 191 (1992) ...................................................................................... 16

11

*Council of Alternative Political Parties v. Hooks*,

12

121 F.3d 876 (3d Cir. 1997) ......................................................................... 15

13

*Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*,

14

497 F. Supp. 3d 371 (D. Minn. 2020) .......................................................... 10

15

*DNC v. RNC*,

16

671 F. Supp. 2d 575 (D.N.J. 2009) ........................................................ 10, 12

17

*Griffin v. Breckenridge*,

18

403 U.S. 88 (1971) ....................................................................................... 13

19

*Kush v. Rutledge*,

20

460 U.S. 719 (1983) ..................................................................................... 13

21

*Lacey v. Maricopa Cnty.*,

22

693 F.3d 896 (9th Cir. 2012) ....................................................................... 14

23

*League of Women Voters of N.C. v. North Carolina*,

24

769 F.3d 224 (4th Cir. 2014) ................................................................. 15, 17

25

*LULAC – Richmond Region Council 4614 v. PILF*,

26

No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ............... 10, 11, 13

27

*Melendres v. Arpaio*,

28

695 F.3d 990 (9th Cir. 2012) ....................................................................... 15

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) .......................................................... 13

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    512 F. Supp. 3d 500 (S.D.N.Y. 2021) ..................................................... 9, 10

*Nat'l Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) ...................................................................... 9

*Ohio Dem. Party v. Ohio Rep. Party*,
    No. 16-cv-02645, 2016 WL 6542486 (N.D. Ohio Nov. 4, 2016), *stay
    granted*, No. 16-4268, 2016 WL 6608962 (6th Cir. Nov. 6, 2016)...................... 10, 12

*Olagues v. Russoniello*,
    770 F.2d 791 (9th Cir. 1985) ...................................................................... 11

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)........................................................................................ 17

*Recovery Hous. Acad. LLC v. Candelario*,
    562 F. Supp. 3d 333 (D. Ariz. 2022) ............................................................. 7

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*,
    44 F.4th 867 (9th Cir. 2022) ......................................................................... 8

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013) ...................................................................... 7

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ...................................................................... 9

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..................................................................................... 8

*United States v. Madden*,
    403 F.3d 347 (6th Cir. 2005) ...................................................................... 17

*United States v. McLeod*,
    385 F.2d 734 (5th Cir. 1967) ...................................................................... 11

*Valle del Sol Inc. v. Whiting*,

    732 F.3d 1006 (9th Cir. 2013) ..................................................................... 16

*Williams v. Rhodes*,

    393 U.S. 23 (1968) ....................................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*,

    555 U.S. 7 (2008) ........................................................................................... 7

*Yick Wo v. Hopkins*,

    118 U.S. 356 (1886) ..................................................................................... 16

**Statutes**

42 U.S.C. § 1973i(b) ........................................................................................... 11

42 U.S.C. § 1985(2) ............................................................................................ 13

42 U.S.C. § 1985(3) ................................................................................... 1, 12, 13

52 U.S.C. § 10101(b) .......................................................................................... 11

52 U.S.C. § 10307(b) .......................................................................................... 1, 9

**Other Authorities**

H. Rep. No. 89-439, 89th Congress, 1st Sess. 32 (1965) .................................... 11

*Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965) ........ 11

Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*,

    89 Fordham L. Rev. 145 (2020) ................................................................... 14

*The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382 (2020).............. 13

# INTRODUCTION

Inspired by a universally debunked propaganda film about the 2020 election, Defendant Clean Elections USA ("CEUSA") and its founder, Defendant Melody Jennings, have recruited groups of people (the Doe Defendants) to stake out ballot drop boxes in Arizona with the express purpose of deterring voters from casting ballots. Defendants openly brag that they have already scared away voters. Last week alone, their activities in Maricopa County led to three voter intimidation complaints that have been referred to the Department of Justice. And the Maricopa County Sheriff's Office has repeatedly had to respond to reports by scared voters when armed individuals, sometimes masked and in tactical gear, gathered near a drop box at night. Defendants say they have recruited thousands and are just getting started.

With Election Day just two weeks away and voting already well under way, a temporary restraining order and preliminary injunction are urgently needed to stop Defendants' lawless conduct before it gets even worse. Plaintiffs are likely to succeed on the merits of their claims. While Defendants' use of social media websites and online media to organize and promote their activities is relatively new, their basic tactic of gathering in large groups to surveil and intimidate voters is a longstanding one that is directly prohibited both by Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and by the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3). Absent immediate relief, Plaintiffs—and voters across Arizona—will suffer irreparable harm. And the balance of the equities and the public interest strongly weigh in favor of protecting Arizona voters from harassment and intimidation, particularly where Defendants' activities are inspired entirely by debunked theories about "ballot mules" that do not exist and never have, and where election officials already monitor drop boxes and have not reported any issues.

The Court should therefore enter a temporary restraining order and preliminary injunction prohibiting Defendants from gathering within sight of drop boxes; from following, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles at or around a drop box; and from

1

1    training, organizing, or directing others to do those activities.

2                                    **BACKGROUND**

3            In the wake of the 2020 election, right-wing commentator Dinesh D'Souza released

4    "2000 Mules," a propaganda film which purported to demonstrate using cellphone location

5    data that thousands of so-called "ballot mules" had delivered stacks of ballots to drop boxes

6    in several states. The film's claims are simply false. Even former Attorney General Bill

7    Barr guffawed when asked about them under oath, explaining that the cellphone data is

8    "singularly unimpressive" and that the premise that it shows the existence of ballot mules

9    was "just indefensible." Declaration of Daniel Arellano (Oct. 23, 2022) ("Arellano Decl.")

10   Ex. A. When there are millions of cell phones in a city, Barr explained, there will almost

11   "by definition" be some that repeatedly pass by particular places over any given time

12   period. *Id.*

13           Unfortunately, the film's unfounded conspiracy theories proved influential among

14   many credulous election deniers, including Defendant Melody Jennings, the founder of

15   Defendant CEUSA. Convinced by the "teasers" for 2000 Mules that "ballot mules" had

16   stolen the 2020 election by "stuffing" drop boxes with fraudulent ballots, Defendant

17   Jennings came up with a plan: she would recruit others on the Trump-owned social media

18   platform Truth Social, where she posts using the username "TrumperMel," with a goal of

19   placing groups of people around every drop box, to deter "mules" from using the drop

20   boxes. *See* Arellano Decl. Ex. B. But there are no "mules"—they are a paranoid

21   conspiracy—so the people Defendant Jennings is targeting are simply voters. She

22   nevertheless founded Defendant CEUSA and initiated a campaign titled

23   "#Dropboxinitiative2022" to put her plan into action. *See id.*

24           Defendants say that they are just watching and photographing voters, not engaging

25   with them. But they openly admit that their purpose is to deter "mules"—which, again, just

26   means voters—from using the drop boxes. As early as August, Defendant Jennings urged

27   Defendants' members and supporters to gather with "[n]o less than 8 people" to watch drop

28   boxes, explaining that "just your presence alone & the mule knowing they will be caught

                                             2

on ur [sic] multiple cameras is enough deterrent to make them shrink back into the darkness":



**TrumperMel** ✅
@TrumperMel · Aug 11

This 🙌🔥🔥🔥

Follow laws. Don't wear MAGA or other clothing that may be seen as electioneering. Abide by the distance guidelines in ur state. No less than 8 people. Be smart. Just your presence alone & the mule knowing they will be caught on ur multiple cameras is enough deterrent to make them shrink back into the darkness. Be aware they will head to another box, so you might as well go ahead &recruit more folks to be at those as well 😎😉

🎉PARTY AT THE DROP BOX🎉
#dropboxinitiative2022

Arellano Decl. Ex. C. The next month, Jennings further emphasized: "10 people in groups around every drop box! Not 2 people. That's not a deterrent. . . . Video, take pics." Arellano Decl. Ex. D. And just last week, Defendant Jennings urged "[a]ll Arizona patriots get to either the Mesa box or the Phoenix box . . . Right now," explaining that more people were needed because "[t]here are mules getting there and doing their thing even with my people there." Arellano Decl. Ex. E.

Defendants' presence is therefore expressly intended to discourage voters from using drop boxes. And there is reason to believe that Defendants in fact do more than passively observe. When someone asked Defendant Jennings on social media just last week, "how are the boxes secured, if you're just filming and getting info on the m[u]les? If the ballots still go in the box, how do we know which ballots are their illegitimate ballots?," Jennings tellingly responded: "Friend, while I would love to tell you all the sauce I don't think that's wise in an open forum." Arellano Decl. Ex. F. In a September podcast appearance, Jennings threatened to dox suspected ballot mules, as well as to report them to a cadre of sheriffs who share Jennings' election-related conspiracy theories. Arellano Decl. Ex. G at 13:27, 18:50, 19:10. And in an interview on October 19 with Steve Bannon, Jennings emphasized "we're geotracking them, we've got cameras on the back-sides of them . . . We have the sauce, we're just showing you that we're out there, and people are coming and joining us." Arellano Decl. Ex. H.

Defendants' plans have not been idle talk. Just last week, Defendants' members and supporters repeatedly gathered outside Maricopa County drop boxes at Defendants' urging to surveil voters. Defendant Jennings posted photographs of the gatherings and referred to the people gathered as "my people," "my crew," "our people," "our beautiful box watchers," and "us," Arellano Decl. Exs. E, I, J, K, and posted photographs of voters using the box, Arellano Decl. Ex. L.

The effect on voters was immediate: over the span of four days, three Maricopa County voters submitted complaints about voter intimidation near both of the county's two outdoor drop boxes. *See* Arellano Decl. Ex. M (explaining that Maricopa's remaining drop boxes are inside city and town facilities). The first complaint, filed on October 17, described "a group of people hanging out near the [Mesa] ballot dropbox filing and photographing my wife and I as we approached the dropbox and accusing us of being a mule. They took photographs of our license plate and of us and then followed us out of the parking lot in one of their cars continuing to film." Arellano Decl. Ex. N. When the complaint was made public, Defendants at first denied responsibility. Arellano Decl. Ex. O. But Defendant Jennings had already posted a photograph of a person that appears to be the complainant using the drop box, along with bizarre accusations that he "pulled ballots out of his shirt" and pleas that they "need people there tonight to help my people. Lots of you!":

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18  Arellano Decl. Ex. L. And in a video interview on Friday, Defendant Jennings admitted

19  that Defendants' members and supporters were present at the Mesa drop box on October

20  17 and saw, photographed, and recorded the voter in question. *See* Arellano Decl. P.

21      The second intimidation complaint, filed on October 19, reported "[c]amo clad

22  people taking pictures of me, my license plate as I dropped our mail in ballots in the box"

23  in Phoenix. Arellano Decl. Ex. Q. The complaint included photographs of the individuals

24  watching the drop box, and those same individuals had identified themselves to a local

25  reporter on video as being affiliated with Defendant CEUSA. *See* Arellano Decl. Ex. R.

26  They otherwise declined to speak to the reporter, saying that they are "not supposed to be

27  having a discussion with anyone about anything" and that they would "like to talk to

28  [CEUSA] before" speaking further to her. *See* Arellano Decl. Ex. S. Defendant Jennings

posted a photo of those same individuals and described them as "[o]ur beautiful box watchers in Maricopa county" in an October 19 Truth Social post. Arellano Decl. Ex. J.

The third complaint described "a group of 5 or 6 20-30 yr old men standing in the parking lot" near the Mesa drop box on October 20 who "took pictures of our license plate and our car" and "claimed they were taking pictures for 'election security.'" Arellano Decl. Ex. Q. While the men did not further identify themselves, Defendants had referred to the press "filming our people at the Mesa Arizona drop box" just the night before, and urged, "Get out there people. Let's go watch that box and make heads pop." Arellano Decl. Ex. I.

Defendants responded to the complaints from voters by escalating the intimidation. On Friday evening, October 21, the Maricopa County Sheriff's Office investigated several individuals in body armor, tactical gear, and disguises watching the Mesa drop box:



Arellano Decl. Ex. T. The Sheriff's Office confirmed that two of those drop box watchers were armed. *Id.* Defendant Jennings responded by reposting a social media post claiming that "by the looks of this video, these people are not doing ANYTHING illegal." Arellano Decl. Ex. U. She proclaimed that "American citizens are still free to protect their elections from enemies foreign and domestic. Winning!!!." Arellano Decl. Ex. W. She claimed responsibility for the armed individuals in tactical gear, describing them as "our people"

and insisting they had done nothing wrong:



Arellano Decl. Ex. X. And she continued to post photographs of voters using Maricopa County drop boxes to her social media accounts. Arellano Decl. Ex Y. The next evening, Saturday October 22, masked and armed individuals once again stationed themselves near the Mesa drop box, prompting the Maricopa County Sheriff's Office to deploy to the scene. Arellano Decl. Ex. Z.

## LEGAL STANDARD

A temporary restraining order or preliminary injunction should issue where the moving party shows: (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm in the absence of relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Recovery Hous. Acad. LLC v. Candelario*, 562 F. Supp. 3d 333, 339 (D. Ariz. 2022) (same standard for temporary restraining order). Even if the moving party can only show that there are "serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the [moving party's] favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace*, Inc., 709 F.3d 1281, 1291 (9th Cir. 2013) (quotation omitted).

**ARGUMENT**

**I.     Plaintiffs are likely to succeed on the merits of their claims.**

      **A.     Plaintiffs have standing.**

Plaintiffs Arizona Alliance for Retired Americans (the "Alliance") and Voto Latino have sufficiently alleged standing, both as organizations and, for the Alliance, on behalf of its constituents. A plaintiff establishes standing by showing it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Both the Alliance and Voto Latino have established organizational standing. "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879–80 (9th Cir. 2022) (citation omitted). Plaintiffs easily satisfy this standard. They help Arizona's elderly, Latinx, and youth communities vote, and will have to divert mission-critical resources to attempt to counteract the negative impacts of Defendants' actions if those actions continue. *See generally* Declaration of Saundra Cole (Oct. 24, 2022) ("Cole Decl."); Declaration of Ameer Patel (Oct. 24, 2022) ("Patel Decl."). For example, if Defendants' activities continue, the Alliance will need to organize media events and member meetings to educate voters about intimidation at drop box sites, Cole Decl. ¶ 14, adjust the script for its regular phone banking activities to ensure voters are aware of potential intimidation, *id.* ¶ 15, and alter its social media and word-of-mouth campaigns to alert voters, *id.* Those resources would otherwise be directed towards the Alliance's traditional voter mobilization efforts. *Id.* ¶ 16. Similarly, if Defendants' activities continue, Voto Latino will need to divert resources to address them, such as by developing and launching an educational campaign on voters' rights and how to respond to voter intimidation, an undertaking that would require significant staff time and resources. Patel Decl. ¶ 13. These types of injuries are sufficient to establish standing. *See Sabra*, 44 F.4th at 879 (finding organizational standing

where organization had to divert resources to create campaign correcting Islamophobic information in professor's course materials); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039–41 (9th Cir. 2015) (finding organizational standing where plaintiff expended additional resources to register voters following change in the law); *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (finding organizational standing where plaintiff would have to divert scare resources to promote awareness of laws).

The Alliance has also established standing on behalf of its members. To establish representational standing, a plaintiff "must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to vindicate are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Smith*, 358 F.3d at 1101–02 (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). An organization need not identify by name its member or members injured "[w]here it is relatively clear . . . that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury." *Nat'l Council*, 800 F.3d at 1041. The Alliance has approximately 50,000 members spanning every county in Arizona. Cole Decl. ¶ 3. Most of the Alliance's members are between 55 and 90 years of age and many have disabilities, and like most Arizona voters, many vote early by mail. *Id.* ¶ 14. The Alliance's members are therefore particularly likely to use drop boxes, and will be harmed by intimidation efforts at those drop boxes. *See id.*

**B.      Defendants have violated Section 11(b) of the Voting Rights Act.**

Section 11(b) of the Voting Rights Act provides that no one, "whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). This "provision applies to private conduct and can be enforced through suit by a private individual." *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) ("*Wohl II*"); *see also Ariz. Dem. Party v. Ariz. Rep. Party*, No. CV-16-

03752-PHX-JJT, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016). It prohibits all actual and attempted voter intimidation, whether or not racially motivated, so a plaintiff need not "allege discrimination or racial targeting to prevail." *Wohl II*, 512 F. Supp. 3d at 509.

Section 11(b) is a broad prohibition: any "actions or communications that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance can constitute unlawful threats or intimidation under the statute." *Id.* at 509. Conduct that puts voters "in fear of harassment and interference with their right to vote" therefore violates Section 11(b). *LULAC – Richmond Region Council 4614 v. PILF*, No. 1:18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018). "The presence of armed 'guards' at the polls with no connection to the state government is certainly likely to intimidate voters." *Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020). But Section 11(b) also protects voters from "subtle, nonviolent forms of intimidation." *Wohl II*, 512 F. Supp. 3d at 510. Courts enforcing Section 11(b) have therefore enjoined defendants from "[f]ollowing, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles at or around a polling place, or training, organizing, or directing others to do the same." *Ohio Dem. Party v. Ohio Rep. Party*, No. 16-cv-02645, 2016 WL 6542486, at *2 (N.D. Ohio Nov. 4, 2016), *stay granted*, No. 16-4268, 2016 WL 6608962 (6th Cir. Nov. 6, 2016); *see also DNC v. RNC*, 671 F. Supp. 2d 575, 622–23 (D.N.J. 2009) (modifying consent decree entered to resolve VRA § 11(b) claims but maintaining provision that RNC could not "videotape, photograph, or otherwise make visual records of voters or their vehicles"). This is consistent with the ordinary meaning of Section 11(b)'s broad text. *See, e.g.*, "Intimidate," Merriam-Webster.com, https://www.m-w.com/dictionary/intimidate ("to make timid or fearful"; "to compel or deter by or as if by threats"), "Threaten," Merriam-Webster.com, https://www.m-w.com/dictionary/threaten ("to utter threats against"; "to hang over dangerously"; "to cause to feel insecure or anxious"); "Coerce," Merriam-Webster.com, https://www.m-w.com/dictionary/coerce ("to restrain or dominate by force"; "to compel to an act or choice"; "to achieve by force or threat").

Moreover, Section 11(b) prohibits intimidation whether or not defendants acted with the specific purpose of intimidating voters. "[T]he plain language of the statute does not require a particular *mens rea*." *Ariz. Dem. Party*, 2016 WL 8669978, at *4 n.3. Indeed, when Congress enacted Section 11(b) in 1965, it specifically omitted language from a very similar provision in the Civil Rights Act of 1957, now codified at 52 U.S.C. § 10101(b), which already prohibited intimidation in nearly identical terms where it was done "for the purpose of interfering with the right of such other person to vote or to vote as he may choose." 52 U.S.C. § 10101(b). "The text of § 11(b), unlike [the Civil Rights Act provision] plainly omits 'for the purpose of,' suggesting § 11(b)'s deliberately unqualified reach." *LULAC – Richmond*, 2018 WL 3848404, at *4. As a result, "unlike [the Civil Rights Act] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown." H. Rep. No. 89-439 at 30, 89th Congress, 1st Sess. 32 (1965); *see also Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965) (Attorney General Katzenbach: under Section 11(b), "no subjective 'purpose' need be shown . . . in order to prove intimidation . . . . Rather, defendants would be deemed to intend the natural consequences of their acts").[1]

Plaintiffs are likely to succeed in showing that Defendants have violated, and continue to violate, Section 11(b) by organizing and encouraging large groups of their supporters—sometimes armed and wearing tactical gear—to gather at Arizona drop boxes

---

[1] In *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985), the Ninth Circuit stated in dicta that section 11(b), then codified at 42 U.S.C. § 1973i(b), required proof that defendants "intend[ed] to intimidate" (emphasis omitted). But that statement was not essential to the court's holding. Moreover, in making it, the court failed to distinguish between section 11(b) (then codified at § 1971i(b)) and § 10101(b) (then codified at § 1971(b)), even though only the latter has an express textual intent requirement, and it relied on the Fifth Circuit's decision in *United States v. McLeod*, 385 F.2d 734, 738 (5th Cir. 1967), which was a decision under § 10101(b) only, and did not involve the VRA at all. *See LULAC-Richmond*, 2018 WL 3848404, at *4. In any event, Defendants here clearly intend to intimidate. *See* Arellano Decl. Ex. C (encouraging large groups to gather at drop boxes for "deterren[ce]"); Arellano Decl. Ex. D (same); Arellano Decl. Ex. G (threatening to dox individuals at drop box sites and report them to sheriff).

and photograph and videorecord voters casting their ballots. Indeed, intimidating voters to deter them from using drop boxes is the open purpose of Defendants' conduct. Defendants themselves have repeatedly boasted that their purpose is to deter suspected "ballot mules" from using drop boxes, and they acknowledge having deterred the submission of ballots. *See, e.g.*, Arellano Decl. Exs. G at 13:27, AA at 8:05. And Defendants have engaged in exactly the sort of conduct that courts have previously considered illegal voter intimidation, including photographing and video-recording voters and their vehicles. *Ohio Dem. Party*, 2016 WL 6542486, at *2; *DNC*, 671 F. Supp. 2d at 622–23. Confirming the point, Arizona voters have repeatedly complained that Defendants' conduct is intimidating and an interference with their right to vote. Arellano Decl. Exs. N, Q. Based on this evidence and more, much of it the direct statements by Defendants themselves, Plaintiffs are likely to succeed in proving that Defendants have either actually or attempted to "intimidate, threaten, or coerce" Arizona voters for "voting or attempting to vote," in violation of Section 11(b).

### C.   Defendants have violated the Support or Advocacy clause of the Klan Act.

Plaintiffs are also likely to prevail on their claim under the Support or Advocacy clause of the Klan Act, 42 U.S.C. § 1985(3), which bars "conspiracy[ies] to interfere with federal elections," *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc). That clause provides "an action for the recovery of damages" to an injured party where:

> two or more persons conspire to prevent by force, intimidation or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy, . . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States.

42 U.S.C. § 1985(3).

The Court should give this statute, like other "Reconstruction civil rights statutes," "a sweep as broad as [its] language." *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971). It requires proof of "(1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486–87 (S.D.N.Y. 2020) ("*Wohl I*").

Plaintiffs are not required to prove that Defendants are motivated by racial or other class-based animus, that Defendants are state actors, or that Defendants have violated a separate constitutional or statutory provision. Courts have consistently held that the Support or Advocacy clause, "unlike the [other parts] of Section 1985(3) does not require allegations of a race or class-based, invidiously discriminatory animus or violation of a separate substantive right." *LULAC-Richmond*, 2018 WL 3848404, at *6; *see also Kush v. Rutledge*, 460 U.S. 719, 721-23 (1983) (analogizing the anti-voter suppression conspiracy bar to 42 U.S.C. § 1985(2), which does not require a racial or other class-based animus); *Wohl I*, 498 F. Supp. 3d at 487 n.31 (noting that the elements under the Support or Advocacy clause of § 1983(5) "differ slightly from the elements" for claims under other clauses of that provision). That makes sense. Unlike the Support or Advocacy clause, the first two clauses of Section 1985(3) refer to "equal protection of the laws" and "equal privileges and immunities under the laws." *See* 42 U.S.C. § 1985(3); *see also Rutledge*, 460 U.S. at 726 (explaining that the "legislative background" of those phrases "does not apply to the portions of [Section 1985] that prohibit interference with . . . federal elections"). Nothing about the text or history of the Support or Advocacy clause indicates that it requires any showing of class-based animus or of a violation of some other, independent right"[2]

---

[2] *See The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382, 1396 (2020) (noting that "nothing in the legislative history [of the Klan Act] endorses a narrow view of the Support or Advocacy Clause" and that "early judicial applications of the Support or Advocacy Clause demonstrate that it was interpreted separately from the" first two clauses

13

Plaintiffs are likely to succeed in making each of the required showings here. *First*, Plaintiffs are likely to succeed on the merits of their claim that Defendants have engaged in a conspiracy. A civil conspiracy is "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). As the Ninth Circuit explained:

> To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.

*Id.* Here, Defendants Jennings and CEUSA share a "common objective" with the Doe Defendants they have recruited and encouraged to surveil drop boxes: to intimidate voters from voting. Defendants have not only agreed on a common plan; they are boasting about it in public and recruiting others. Defendant Jennings has encouraged CEUSA's supporters, including the Doe Defendants, to act as "deterrent[s]" at drop boxes by gathering in groups of "[n]o less than 8 people" at specific drop boxes in Arizona. Arellano Decl. Ex. C; *see also* Arellano Decl. Ex. D. This is objectively intimidating behavior. Moreover, Defendant Jennings has *admitted* that in some instances Arizona voters retreated from drop boxes after encountering Defendants' coordinated gatherings. Arellano Decl. Ex. AA at 8:00.

*Second*, Plaintiffs will likely prove the conspiracy is directed at preventing lawful voters from voting "by force, intimidation, or threat." For the reasons laid out above, Defendants' efforts are plainly designed to threaten, coerce, and intimidate voters. And each co-conspirator has performed an act in furtherance of that conspiracy. Defendant Jennings has, personally and on behalf of CEUSA, encouraged volunteers to deter

---

of Section 1985(3)); Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 157 (2020) (explaining that due to reorganizations of the federal code since the passage of the Klan Act, "it is a mistake to treat § 1985(3) as a meaningful unit").

individuals from using drop boxes. *See* Arellano Decl. Exs. C, D. Groups of individuals associated with CEUSA filmed, photographed, and followed voters approaching drop boxes and their vehicles. Arellano Decl. Exs. J, L, N, P, Q, R, S. Several stationed themselves near drop boxes in the evening with disguises, tactical gear, magazine clips, and firearms. Arellano Decl. Exs. T, U, X, Z. Each of these acts, and many others, have furthered the conspiracy to intimidate voters.

*Third and finally*, each of the acts described above are likely to injure Plaintiffs by forcing them to divert organizational resources to warn the communities they serve about the threat of intimidation, and in the case of the Arizona Alliance, by depriving its members of their legal right to vote without intimidation, Cole Decl. ¶¶ 12–13, 14–16; Patel Decl. ¶¶ 11–13.

## II. Plaintiffs will suffer irreparable harm in the absence of relief.

Immediate injunctive relief is necessary to protect Plaintiffs (as well as countless other Arizona voters) against severe and irreparable harm that is threatened by Defendants' actions. First, the Arizona Alliance's 50,000 members are among those whose voting rights are at risk. *Supra* Part I.A. Interference with the right to vote necessarily constitutes irreparable harm because it cannot be remedied after the election. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("once the election occurs, there can be no do-over and no redress"); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (finding irreparable harm based on alleged denial of "voting and associational rights" because infringement of those rights "cannot be alleviated after the election"); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"). "Consequently, if potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished," that harm is irreparable. *Ariz. Dem. Party*, 2016 WL 8669978, at *11. And "if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes

cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact." *Id.* Second, if Defendants' intimidation continues, Plaintiffs will be forced to divert limited resources and staff time to educating voters about how to respond to and resist Defendants' intimidation efforts, to ensure that Plaintiffs' members and constituencies do not succumb to them. *Supra* Part I.A. The resulting "ongoing harms to their organizational missions," too, is irreparable harm. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

**III.    The balance of the equities and the public interest favor Plaintiffs**

Finally, the balance of the equities and the public interest also favor Plaintiffs. Defendants claim that their activities are needed to detect and deter so-called "ballot mules"—a reference to widely debunked conspiracy theories promoted by the right-wing film 2000 Mules. But 2000 Mules' assertions about widespread ballot harvesting were based almost entirely on the claim—which even Bill Barr found literally laughable, *see* Arellano Decl. Exs. A, BB—that anyone who "went near a drop box more than 10 times and a nonprofit more than five times from Oct. 1 to Election Day" was engaged in ballot harvesting, rather than, say, driving a taxi or delivering mail. *See* Arellano Decl. Ex. CC. There is simply no evidence of any meaningful problem with ballot harvesting by "ballot mules" in Arizona—or anywhere else in the United States—that Defendants' activities could possibly be needed solve. And Arizona election officials *already* monitor and secure drop boxes. There is no evidence whatsoever that this is in any way insufficient.

Defendants' activities thus have no benefit, but they do impose very substantial harms. The constitutional interest at stake in this litigation is the voters' "most precious" "right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.), and laws that protect voters from intimidation safeguard the "fundamental political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Thus, "voter intimidation and coercion [are] . . . obvious harm[s]

that federal law strongly and properly prohibits." *United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part). And "[b]y definition, [t]he public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters*, 769 F.3d at 247; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the fundamental political right to vote").

## CONCLUSION

The Court should grant a temporary restraining order and a preliminary injunction prohibiting Defendants gathering within sight of drop boxes; from following, taking photos of, or otherwise recording voters or prospective voters, those assisting voters or prospective voters, or their vehicles at or around a drop box; and from training, organizing, or directing others to do the same.

Dated: October 24, 2022

Respectfully submitted,

*/s/ Daniel A. Arellano*
Roy Herrera (No. 032901)
Daniel A. Arellano (No. 032304)
Austin T. Marshall (No. 036582)
**HERRERA ARELLANO LLP**
530 East McDowell Road, Suite 107-150
Phoenix, Arizona 85004-1500

Elisabeth Frost*
David Fox*
Harleen K. Gambhir*
Tina Meng*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002

* Application for *Pro Hac Vice* Forthcoming

*Counsel for Plaintiffs*

17