**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Alliance for Retired Americans, et al., | No. CV-22-01823-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Clean Elections USA, et al., | |
| Defendants. | |

Earlier this year, filmmaker Dinesh D'Souza released *2000 Mules*. In it, D'Souza argued a theory of widespread voter fraud involving mail-in ballots and drop boxes. The film prompted Melody Jennings to organize, under the banner Clean Elections USA, a group of Arizona citizens to monitor two early voting ballot drop box locations in Maricopa County. This activity, which includes surveillance, photography, video recording, and social media activity, has alarmed voters, elected officials, and elections personnel. It has generated national media coverage. Many voters have filed official complaints with the Arizona Secretary of State and have even sought out law enforcement assistance.

All of this prompted the Arizona Alliance for Retired Americans ("Arizona Alliance") and Voto Latino to file this federal lawsuit alleging that Clean Elections USA ("CEUSA") and Jennings have violated Section 11(b) of the Voting Rights Act and the Support or Advocacy Clause of the Ku Klux Klan Act. Because voting is presently underway, Plaintiffs seek a Temporary Restraining Order and Preliminary Injunction. (Doc. 2.) Agreeing with Plaintiffs that the situation requires prompt judicial attention, the

Court held an evidentiary hearing on their Motion. Defendants appeared through counsel. After considering the Motion, legal authorities, record evidence, and arguments of counsel, the Court concludes that it cannot grant the requested relief.

## I.   FACTUAL BACKGROUND

The contentious events surrounding the 2020 presidential election sparked an onslaught of speculation related to the validity and legitimacy of the electoral process. One such theory gained significant online prominence following the release of the *2000 Mules* film. Primarily based on anonymized cellphone location data, the film tells the story of a shadowy network of "ballot mules" working to influence the 2020 election outcome by collecting fraudulent absentee ballots and strategically depositing them in early voting drop boxes throughout key electoral states.[1] Inspired by the film, Ms. Jennings founded CEUSA[2] and formulated a plan of action—#Dropboxinitiative2022—with the purpose of deterring so called "ballot mules" from using drop boxes. Using social media, Ms. Jennings encouraged supporters and affiliates to gather near drop boxes in groups of "[n]o less than 8 people" to track and deter these supposed "mules." (Doc. 2 at 8.)

In the last several days, three separate Maricopa County voters filed formal complaints relating to voter intimidation near both early voter drop boxes. Both drop boxes are in parking lots and are positioned to allow voters to deposit ballots from their vehicles, drive-up style. The first complaint alleges that a group of individuals gathered near the Mesa, Arizona ballot drop box photographed and accused the voter and his wife of being mules. The voter further alleges that these individuals got in their vehicle and briefly followed him out of the parking lot to photograph his vehicle's license plate. (Doc. 3 at 36.) The second complaint reported that individuals took photographs of a voter and his vehicle's license plate while depositing mail-in ballots. (*Id.* at 54.) The third complaint described a group of five or six men standing in the Mesa ballot drop box parking lot taking photographs of the voter's vehicle and license plate. (*Id.* at 52.) In addition to these formal

---

[1] In relation to this, Arizona law prohibits a person from collecting voted or unvoted early ballots from another person, with some exceptions. A.R.S. § 16-1005(h).
[2] As far as the Court can tell, CEUSA is not organized as a valid legal entity under the laws of any state and appears to simply be a web domain name.

1   complaints, the Maricopa County Sheriff's Office was dispatched to the Mesa drop box
2   location to investigate armed and masked observers wearing body armor. (*Id.* at 60.) All
3   the while, Ms. Jennings used her social media account to publicize the work of her
4   volunteers and recruit others. (*Id.* at 15.)

5   **II.    LEGAL STANDARD**

6          A party facing irreparable harm prior to the conclusion of litigation may ask the
7   court to grant a temporary restraining order or preliminary injunctive relief. Fed. R. Civ. P.
8   65. The standard for issuing a temporary restraining order is the same as the standard for
9   issuing a preliminary injunction. *Phillips v. Fremont Inv. & Loan*, No. CV-09-2585-PHX-
10  GMS, 2009 WL 4898259, at *1 (D. Ariz. Dec. 11, 2009). Plaintiffs must show that they
11  are (1) likely to succeed on the merits, (2) likely to suffer irreparable harm without an
12  injunction, (3) that the balance of the equities tips in their favor, and (4) that an injunction
13  is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). If the
14  moving party "can only show that there are serious questions going to the merits—a lesser
15  showing than likelihood of success on the merits—then a preliminary injunction may still
16  issue if the balance of hardships tips sharply in the [moving party's] favor, and the other
17  two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281,
18  1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135
19  (9th Cir. 2011)) (cleaned up). "Serious questions are substantial, difficult and doubtful, as
20  to make them a fair ground for litigation and thus for more deliberative investigation."
21  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1998) (en banc)
22  (internal marks and citation omitted).

23  **III.   ANALYSIS**

24          **A.    Standing**

25          Article III of the Constitution requires that a plaintiff demonstrate "the core
26  component of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy
27  Article III's standing requirements, a plaintiff must show that he suffered a "concrete and
28  particularized" injury that is "fairly traceable to the challenged action of the defendant,"

and that a favorable decision would likely redress the injury. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). The complaint must "alleg[e] specific facts sufficient" to establish standing. *Schmier v. U.S. Ct. of Appeals for Ninth Cir.*, 279 F.3d 817, 821 (9th Cir. 2002). A complaint that fails to allege facts supporting standing is subject to dismissal. *See, e.g.*, *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).

An organization has standing "to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). "[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879-80 (9th Cir. 2022) (citation omitted). An organization also has "associational standing" to bring suit on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc.*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

The Court finds that Arizona Alliance has established organizational and associational standing for itself. Arizona Alliance is a chartered affiliate of the Alliance for Retired Americans, an allied organization of the AFL-CIO, and counts approximately 50,000 retirees from across Arizona as members. (Doc. 4 at 2.) As its injury, Arizona Alliance showed that Defendants' conduct requires that it divert financial resources to assist its members to cope with the effects of drop box monitoring. Specifically, Arizona Alliance alleges that it must now organize media events and member meetings as well as shift its script for phone banking activities to educational programs. (*Id.* at 4.) Moreover, the representatives from Arizona Alliance who testified at the evidentiary hearing explained that its members are fearful of and feel intimidated by the drop box observers.

The Court, however, finds that Voto Latino does not have standing. For its part,

Voto Latino maintains that it *may* need to spend considerable funds and effort to develop an educational campaign on how to respond to voter intimidation. (Doc. 5 at 3.) But these allegations are too speculative. Moreover, compared to Arizona Alliance, Voto Latino admittedly has a significantly greater budget to spend on its activities, and it is not clear to the Court that its potential response would even require it to reroute financial resources. Voto Latino has not shown any other concrete or particularized injury. *See Sabra*, 44 F.4th at 879 (holding that organizations may establish standing "by showing that they would have suffered some other injury had they not diverted resources to counteracting the problem") (internal marks and citation omitted). Because the Court finds that Voto Latino has not demonstrated Article III standing, the Court will dismiss it from the case.

### B.    Likelihood of Success on the Merits

#### i.    The Voting Rights Act

Section 11(b) of the Voting Rights Acts states that no person, "whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). The text of Section 11(b) sweeps broadly. It is well established that this provision applies to private conduct and can be enforced through private litigation. *See e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) (citing *League of United Latin Am. Citizens – Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) ("*LULAC*"); *Ariz. Dem. Party v. Ariz. Rep. Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (citing *Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56, n.18 (1969)). As the *LULAC* court reasoned, the "or otherwise" language in the statute is indicative of Congressional intent to regulate both private and public conduct under Section 11(b). *LULAC*, 2018 WL 3848404, at *3.

Here, Plaintiffs contend that Defendants have violated Section 11(b) through acts of intimidation or attempted intimidation. Determining what constitutes intimidation is left to the courts, as that term is not defined in the statute. The starting point for interpreting a

statute is the language of the statute itself. *See Wohl*, 512 F. Supp. 3d at 509. Therefore, the dictionary definitions of "intimidate" and "threaten" are instructive. "Intimidate" means to "make timid or fearful" or "inspire or affect with fear," especially "to compel action or inaction (as by threats)." Webster's Third New International Dictionary 1183 (1966). "Threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." *Id.* at 2381.

Importantly, any definition of intimidation must account for rights established in the Constitution. In *Wohl*, the court balanced these interests and held that "intimidation includes messages that a reasonable recipient, familiar with the context of the message, would interpret as a threat of injury—whether physical or nonviolent—intended to deter individuals from exercising their voting rights." 512 F. Supp. 3d at 509. "[A]ctions or communications that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance" can violate Section 11(b). *Id.* So long as the allegedly threatening or intimidating conduct puts individuals "in fear of harassment and interference with their right to vote," the conduct is sufficient to support a Section 11(b) claim. *LULAC*, 2018 WL 3848404, at *4 (citing *Damon v. Hukowitz*, 964 F. Supp. 2d 120, 149 (D. Mass. 2013)). The statute prohibits this level of activity regardless of whether defendants acted with the specific intent of intimidating or threatening voters. *See Ariz. Dem. Party*, 2016 WL 8669978, at *4 n.3 ("[T]he plain language of the statute does not require a particular *mens rea*."); *see also* H. Rep. No. 89-439 at 30, 89th Congress, 1st Sess. 32 (1965) ("[U]nlike the [Civil Rights Act] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown.").

Plaintiffs' primary aim, as the Court finds it, is to put an end to Defendants' drop-box surveillance activities. This requires a further free speech analysis. Not all of Defendants' challenged conduct involves traditional speech. And the mere act of poll watching is not a fundamental right that carries its own distinct First Amendment protection. *See Ariz. Dem. Party*, 2016 WL 8669978, at *11 (citing *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("[P]oll watching is not incidental to this right and

has no distinct First Amendment protection."); *Turner v. Cooper*, 583 F. Supp. 1160, 1161-62 (N.D. Ill. 1983) (holding that the act of poll watching is not protected by the First Amendment)). But the Supreme Court instructs that the protections of the First Amendment do "not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Rather, constitutional protection also extends to expressive conduct. *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006). To merit First Amendment protection, conduct must be "inherently expressive." *Id.* Crucially, however, expressive conduct need not convey a specific message. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). The critical question is whether a reasonable observer would interpret the conduct as conveying *some* sort of message. *Id.* ("A narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.").

The evidence in the record shows that Defendants' objective is deterring supposed illegal voting and illegal ballot harvesting. Ms. Jennings' social media posts demonstrate that she believes the presence of her volunteers alone would convey messages to these supposed "ballot mules." (Doc. 2 at 7-8.) The message is that persons who attempt to break Arizona's anti-ballot harvesting law will be exposed. On this record, therefore, the Court finds that a reasonable observer could interpret the conduct as conveying some sort of message, regardless of whether the message has any objective merit.

Additionally, it is well-established that there is a "First Amendment right to film matters of public interest." *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). The Supreme Court has recognized a right to gather news. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). And the public has a First Amendment right to "receive information and ideas." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576 (1980) (citation omitted); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to

prohibit government from limiting the stock of information from which members of the public may draw."). This right to receive information exists regardless of that information's social worth. *Stanley v. Georgia*, 394 U.S 557, 564 (1969).

Having established that the conduct at issue here is subject to the protections of the First Amendment, the Court must analyze whether any well-established exception applies. At the hearing, Plaintiffs argued that the true threats doctrine precludes First Amendment protection. Plaintiffs are correct. The First Amendment does not protect speech that constitutes "true threats." *See e.g.*, *Virginia v. Black*, 538 U.S. 343, 360 (2003); *Watts v. U.S.*, 394 U.S. 705, 708 (1969); *U.S. v. Tan Duc Nguyen*, 673 F.3d 1259, 1266 (9th Cir. 2012). True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of *unlawful* violence to a particular individual or group of individuals," though the speaker "need not actually intend to carry out the threat." *Black*, 538 U.S. at 359-60 (emphasis added). In determining whether speech is a true threat, the Court considers "the surrounding events and reaction of the listeners." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002) (en banc) (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)). Even a statement that appears to threaten violence may not be a true threat if the context indicates that it only expressed political opposition or was emotionally charged rhetoric. *See Watts*, 394 U.S. at 706-08 (statement "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." at a rally is protected); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 902, 928 (1982) (statement "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck" at a rally is protected as "emotionally charged rhetoric"). Conversely, a statement that does not explicitly threaten violence may be a true threat where a speaker makes a statement against a known background of targeted violence. *See Black*, 538 U.S. at 360 (because of its history as a white-supremacist symbol, burning a cross is "often" a true threat); *Planned Parenthood*, 290 F.3d at 1085-86 ("WANTED" posters targeting doctors who performed abortions were true threats because both the speakers and the

audience knew that the doctors identified in prior posters had been murdered).

Plaintiffs have not provided the Court with any evidence that Defendants' conduct constitutes a true threat. On this record, Defendants have not made any statements threatening to commit acts of unlawful violence to a particular individual or group of individuals. There is no evidence that Defendants have publicly posted any voter's names, home addresses, occupations, or other personal information. In fact, Jennings continuously states that her volunteers are to "follow laws" and that "[t]hose who choose to break the law will be seen as an infiltrator intent on causing [CEUSA] harm." (Doc. 2 at 8; Doc. 3 at 39.) Jennings' social media posts also admonish volunteers to remain outside the statutorily prescribed seventy-five-foot voting location radius.[3] (Doc. 3 at 29.) Furthermore, the record contains evidence of Jennings' social media posts instructing her affiliates not to engage with or talk to individuals at the drop boxes. (Doc. 2 at 10.) Even if these statements are mere window dressing, a reasonable listener could not interpret Ms. Jennings' social media pronouncements that alleged "mules" will "shrink back into the darkness" following her drop box initiative as true threats. *See Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2022) (reasoning that courts "in this circuit have long employed an objective test for determining when speech is a true threat") (internal marks and citation omitted).

Also, Defendants' conduct does not fall into any traditionally recognized category of voter intimidation. *Cf. Nguyen*, 673 F.3d at 1265 (concluding that the wide distribution of a letter among Latino immigrants warning "that if they voted in the upcoming election their personal information would be collected" and could be provided to anti-immigration organizations constitutes sufficient evidence to find unlawful intimidation under California law); *U.S. v. McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967) (holding that a pattern of baseless arrests of Black individuals attending a voter-registration meeting was intimidating and coercive conduct given its "chilling effect" on voter registration); *U.S. v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965) (holding that a landowner's restriction of an

---

[3] Arizona law provides that "a person shall not be allowed to remain inside the seventy-five foot limit while the polls are open, except for the purpose of voting . . . and no electioneering may occur within the seventy-five foot limit." A.R.S. § 16-515(A).

insurance collector's access to the landowner's property due to the insurance collector's efforts to register voters constitutes unlawful intimidation); *U.S. v. Beaty*, 288 F.2d 653, 654-57 (6th Cir. 1961) (holding that the eviction of sharecroppers as punishment for voter registration constitutes unlawful intimidation). In *Daschle v. Thune*, No. 04-CV-4177 (D.S.D. Nov. 2, 2004)[4], for example, the court enjoined defendants from following Native American voters from the polling locations or copying any of the Native Americans' license plate information. The court in *Thune* justified its injunction because there was intimidation particularly targeted at Native Americans – reasoning that the public interest is served by having no minority denied an opportunity to vote. There is no evidence here that the voters using the outdoor drop boxes are primarily minorities or that they have historically been victims of targeted violence. Taken together, the Court cannot conclude that Defendants' conduct constitutes a true threat.

The Court has struggled to craft a meaningful form of injunctive relief that does not violate Defendants' First Amendment rights and those of the drop box observers. The Court acknowledges that Plaintiffs and many voters are legitimately alarmed by the observers filming at the County's early voting drop boxes. But on this record, Defendants' conduct does not establish a likelihood of success on the merits that justifies preliminary injunctive relief. Alternatively, while this case certainly presents serious questions, the Court cannot craft an injunction without violating the First Amendment.

### ii.     The Ku Klux Klan Act

The Support or Advocacy clause of the Ku Klux Klan Act (the "Klan Act") provides an injured party with a right of action for recovery of damages against a person who, with another person:

> conspire[s] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a member of Congress . . .

---

[4] This is an unpublished case from the District of South Dakota that is not available on Lexis or Westlaw.

42 U.S.C. § 1985(3). In shorthand, the law prevents "conspirac[ies] to interfere with federal elections." *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc). Plaintiffs must demonstrate proof of the following: "(1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486-87 (S.D.N.Y. 2020).

Unlike Section 11(b) of the Voting Rights Act, the Support or Advocacy clause of the Klan Act contains language requiring intent. As noted above, Plaintiffs must show proof that the purpose or intent of Defendants' conspiracy was to intimidate or threaten voters from engaging in lawful activity related to voting in federal elections. But Plaintiffs have not provided the Court with evidence that Defendants intend to prevent lawful voting. Rather, Defendants stridently maintain that they seek to prevent what they perceive to be widespread illegal voting and ballot harvesting. For these reasons, the Court finds that Plaintiffs are unlikely to succeed on the merits and that there is no serious question going to the merits of Plaintiffs' Klan Act claim.

### C.    Irreparable Harm

It is well established that the abridgement or interference with the right to vote constitutes irreparable injury. *See e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (stating that the right to vote is "a fundamental political right, because [it] is preservative of all rights"); *Cardona v. Oakland Unified Sch. Dist., California*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgment or dilution of a right so fundamental as the right to vote constitutes irreparable injury."). If the electorate suffers "intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished, Plaintiff would be irreparably harmed." *Ariz. Dem. Party*, 2016 WL 8669978, at *11.

In analyzing this factor, "the Court does not assess the likelihood that such harm will occur, but, if such harm does occur, whether it will be irreparable." *Id.* Should Defendants' alleged intimidation dissuade voters from exercising their franchise rights via drop box, those voters will be irreparably harmed. Indeed, "it is unlikely those voters can

be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact." *Id.* Because the Court does not consider the likelihood of the alleged harm occurring, the Court finds that this factor tips in Plaintiffs' favor.

### D.    Balance of the Equities & Public Interest

The Court will balance both the Plaintiffs' and the public's interest in protecting voters from harassment, intimidation, coercion, or fear thereof, against Defendants' constitutional rights. As noted above, the right to vote is fundamental. *See Reynolds*, 377 U.S. at 562. Indeed, there is no right "more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) ("There is no doubt that the right to vote is fundamental . . . ."). The public has a strong interest in free and fair elections. Moreover, states have a compelling interest in maintaining the integrity of the voting place and preventing voter intimidation and confusion. *Burson v. Freeman*, 504 U.S. 191, 198 (1992). Accordingly, both Plaintiffs and the public have a strong interest in allowing every registered voter to do so freely.

On the other hand, the requested preliminary injunctive relief implicates serious First Amendment considerations. An individual's right to vote is fundamental. But so too is an individual's right to engage in political speech, assemble peacefully, and associate with others. *See e.g.*, *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . [including] discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 146 (2d Cir. 2000) ("The right to political association also is at the core of the First Amendment, and even practices that only potentially threaten political association are highly suspect.") (internal marks and citation omitted). While the Court

may only enjoin Defendants and their affiliates, any injunctive relief would likely have a chilling effect on others' constitutionally protected activity. And Plaintiffs have failed to provide the Court with a narrowly tailored injunction that would avoid sweeping in protected activity. *See e.g.*, *Rodriguez v. Robbins*, 715 F.3d 1127, 1133 (9th Cir. 2013) (explaining that "[a]n overbroad injunction is an abuse of discretion"); *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) ("[O]ne basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.") (internal marks and citation omitted); *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) ("[A]n injunction should not impose unnecessary burdens on lawful activity.").

The parties implicate rights equally crucial to the functioning of our Republic, and the public has a strong interest in maintaining them. Thus, the Court finds that the balance of the equities and the public interest factors is neutral.

## IV.    CONCLUSION

Plaintiffs have failed to show that they are likely to succeed on the merits. While there are serious questions implicated, the Court cannot provide preliminary injunctive relief without infringing core constitutional rights. Further, while the irreparable harm factor tips in favor of Plaintiffs, the balance of the equities and public interest do not. A preliminary injunction cannot issue on these facts, but Arizona Alliance is invited to return to this Court with any new evidence that Defendants have engaged in unlawful voter intimidation.

. . .

. . .

. . .

. . .

- 13 -

1    Accordingly,

2    **IT IS ORDERED**:

3    1.    Denying Plaintiffs' Motion for Temporary Restraining Order and

4 Preliminary Injunction (Doc. 2).

5    2.    Granting Plaintiffs' Motion for Leave to File Notice of Additional Authority

6 (Doc. 28) and directing the Clerk of Court to file the Proposed Notice of Additional

7 Authority (lodged at Doc. 29).

8    3.    Directing the Clerk of Court to dismiss Plaintiff Voto Latino from this case.

9    4.    As this Order is not dispositive, the Clerk of Court shall not close this case.

10    Dated this 28th day of October, 2022.

Michael T. Liburdi
United States District Judge

- 14 -