Alexander Kolodin (SBN 030826)
Veronica Lucero (SBN 030292)
**Davillier Law Group, LLC**
4105 N. 20th St. Ste.110
Phoenix, AZ 85016
Phone: (602) 730-2985
Fax: (602) 801-2539
Emails:
Akolodin@davillierlawgroup.com
Vlucero@davillierlawgroup.com
Phxadmin@davillierlawgroup.com

*Attorneys for Defendants Clean Elections USA
And Melody Jennings*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Alliance for Retired Americans, League of Women Voters of Arizona,<br><br>　　　　　　　Plaintiffs,<br>v.<br><br>Clean Elections USA, et al,<br><br>　　　　　　　Defendants. | CASE NO: CV-22-01823-PHX-MTL (Consolidated with CV-22-08196-PCT-MTL)<br><br><br>**DEFENDANTS' CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' COMPLAINTS** |

Pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure, Defendants Melody Jennings and Clean Elections USA move to dismiss Plaintiffs' consolidated lawsuit for the reasons set forth in the Memorandum of Points and Authorities below.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff Arizona Alliance for Retired Americans (the "Alliance") and Plaintiff League of Women Voters (the "League"), collectively "Plaintiffs," brought their respective lawsuits (and motions for a temporary restraining order and preliminary injunction) against Defendants Melody Jennings and her organization, Clean Elections USA[1], on October 24, 2022 (Dkt. No. 1-2), and October 25, 2022 (Dkt. No. 24). In essence, both suits (1) claimed that Ms. Jennings and her organization, via her website and social media, violated Section 11(b) of the Voting Rights Act of 1965 ("VRA"), codified at 52 U.S.C. § 10307(b), and the Klu Klux Klan Act ("Klan Act"), codified at 42 U.S.C. § 1985(3), and (2) sought declaratory and injunctive relief and monetary damages against Ms. Jennings and Clean Elections USA. *Compare* Alliance Compl. at 38-39 *with* League Compl. at 28.

Ms. Jennings became aware of the lawsuit on October 25, the same day undersigned counsel entered an appearance on her behalf. (Dkt. No. 16.) On October 26, this Court held a hearing on the Alliance's Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. No. 21), which the Court then denied on October 28 (Dkt. No. 32).

The Court subsequently consolidated the League's action with the Alliance's on October 31 and set an evidentiary hearing for November 1 on the League's Motion for a Temporary Restraining Order and Preliminary Injunction. (Dkt. No. 43). Prior to the

---

[1] For all intents and purposes, Clean Elections USA was essentially a website promoting election integrity. The website is no longer functional. *See* https://cleanelectionsusa.org/.

hearing, the Court ordered the parties to confer regarding whether the consolidated case could be resolved, in whole or in part, by agreement. (*Id.*) The parties conferred and reached agreement on all but three terms for entry of a Stipulated Temporary Restraining Order ("TRO"). (Dkt. No. 47).  Shortly after the hearing on November 1, one week before the Arizona 2022 General Election, the Court granted the parties' proposed TRO but also included the three terms proposed by Plaintiffs and opposed by Defendants. (Dkt. No. 50-51).

Due to the incredibly truncated nature of the proceedings, Ms. Jennings was not able to offer testimony at either of the hearings but was agreeable to entry of the TRO for this election cycle. Although the TRO infringed on her First Amendment rights, Ms. Jennings was hopeful that the TRO would resolve this litigation. Now that the election has come and gone, and the Clean Elections USA website is no longer functional, however, Plaintiffs' claims for injunctive relief should be dismissed as moot. Even if Plaintiffs were to amend their complaints to allege future injury by Defendants, such allegations would be too speculative to support injunctive relief. And while Plaintiffs have claimed damages to guard against mootness, these claims must fail because Plaintiffs fail to allege any concrete damages to their organizations caused by *Ms. Jennings* or *Clean Elections USA*. With a moot claim for injunctive relief, and no plausible damages claim, their case must be dismissed.

Additionally, whether the now expired TRO may or may not have been narrowly tailored to serve a compelling government interest in preventing voter intimidation, a preliminary and permanent injunction—at this juncture—would certainly violate the First Amendment rights of Ms. Jennings, as it would be an overly broad restriction on her right to speak, associate, and assemble, chilling not only her rights but also the rights of others who wish to take a stand on election integrity—however unpopular and discomfiting that topic may seem to Plaintiffs. Moreover, Plaintiffs no longer have standing, if indeed they ever did, to maintain this suit, and they have also failed to allege a violation of the VRA and Klan Act by *Defendants*.

1    For all of these reasons, the Court should dismiss this consolidated case against
2    Ms. Jennings and her organization.

3                              **LEGAL STANDARD**

4    "To survive a motion to dismiss, a complaint must contain sufficient factual matter,
5    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,
6    556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
7    A "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires
8    more than labels and conclusions, and a formulaic recitation of the elements of a cause of
9    action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). A plaintiff cannot meet
10   his burden simply by contending that he "might later establish some 'set of [undisclosed]
11   facts' to support recovery." *Id.* at 561. Rather, a "claim has facial plausibility when the
12   plaintiff pleads factual content that allows the court to draw the reasonable inference that
13   *the defendant* is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis
14   added). It is not sufficient for the complaint merely to establish a "sheer possibility that
15   the defendant has acted unlawfully. Where a complaint pleads facts that are 'merely
16   consistent with' a defendant's liability, it 'stops short of the line between possibility and
17   plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). To
18   determine whether a complaint states a plausible claim for relief, a court must rely on its
19   "judicial experience and common sense." *Id.* at 679.

20                              **ARGUMENT**
21   **I.    Plaintiffs have failed to state a claim for violation of the VRA or Klan Act**
22   **       by *Defendants*. Alternatively, they have failed to state a claim that they**
23   **       have suffered any compensable damages.**

24       Section 11(b) of the Voting Rights Acts states that no person, "whether acting
25   under color of law or otherwise, *shall* intimidate, threaten, or coerce, *or attempt* to
26   intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. §
27   10307(b) (emphasis added). As this Court explained in its October 28 Order, determining
28   what constitutes intimidation is left to the courts, as that term is not defined in the statute.
     (Dkt. No. 32 at 5.) The Court further explained that the starting point for interpreting a

statute is the language of the statute itself (*id.* at 5-6 (citing *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021))) and concluding that "intimidate" means to "make timid or fearful" or "inspire or affect with fear," especially "to compel action or inaction (as by threats)," and "threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress" (*id.* at 6 (citations omitted)).

Plaintiffs contend that Ms. Jennings and her organization have violated Section 11(b) through acts of intimidation or attempted intimidation, but they have failed to offer any facts actually and directly connecting their cited examples of intimidation to *Defendants*. Both complaints fail to offer anything "more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555, that Ms. Jennings and her organization intimidated or attempted to intimidate lawful Arizona voters.

A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that *the defendant* is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added). It is not sufficient for the complaint merely to establish a "sheer possibility that the defendant has acted unlawfully. Where a complaint pleads facts that are '*merely consistent with' a defendant's liability*, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (emphasis added). To determine whether a complaint states a plausible claim for relief, a court must rely on its "judicial experience and common sense." *Id.* at 679.

Here, both complaints fail to plead factual content that allows the Court to infer that Ms. Jennings and her organization acted unlawfully. Instead, at most, the complaints establish a "sheer possibility" of intimidation by Ms. Jennings, "plead[ing] facts that are 'merely consistent with' [her] liability.'" *Id.* at 678. Specifically, in many instances, the League Complaint fails to even specify which of the many named defendants is

responsible for the factual allegations[2] while simultaneously pleading irrelevant but inflammatory facts. *See, e.g.*, League Compl. at ¶ 25 ("Defendants and others[3] have been actively planning…."), ¶ 26 (naming unspecified "Defendants"), ¶ 28 (irrelevantly calling attention to *2000 Mules* "activists" who are not named in this lawsuit), ¶ 30 (naming unspecified "Defendants").

Although the League does specifically allege that Ms. Jennings and her organization are responsible for the allegations in paragraphs 43 through 67 of its complaint, these allegations, at most, merely establish a "sheer possibility" of intimidation by Ms. Jennings and "are 'merely consistent with' [her] liability' and therefore do not allow "the court to draw the reasonable inference that *the defendant* is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added).

**Paragraph 43** of the complaint uses the word "harass" twice, but invoking this word fails to allege anything "more than labels and conclusions." *Twombly*, 550 U.S. at 555. **Paragraph 44** mentions the "mules conspiracy" but fails to allege illegal voter intimidation by Defendants, instead describing protected First Amendment speech. **Paragraph 45** describes what appears to be Defendants' satisfaction with deterrence of illegal activity rather than any actual illegal activity by Ms. Jennings. **Paragraph 46** fails to allege illegal voter intimidation but instead establishes that Ms. Jennings only wishes to engage with those "who already believe in the 'mules' conspiracy theory." Of course, she has the right to freely associate with likeminded people. **Paragraph 47** makes a conclusory and unsupported allegation that not only fails to establish that Ms. Jennings

---

[2] However, paragraphs 31-42 of the complaint appear to address the dismissed defendants (League Compl. ¶ 31), who are apparently responsible for "invoking the language of war" (*id.* ¶ 39), for "publicly affirm[ing] that their drop box observers may be armed (*id.* ¶ 40), and for having "deep ties to extremist groups" and "endorsing political violence" (*id.* ¶ 41). Although the complaint does not allege that Ms. Jennings is affiliated with any of these defendants or their actions, Plaintiffs seem to insinuate that she is guilty by being associated with them as a named defendant in the same lawsuit rather than guilty by true association with them.

[3] Who are these "others," and which defendants are responsible?

lacks a good-faith basis to believe that ballot harvesting is observable but that also fails to establish illegal voter intimidation. **Paragraph 48** fails to establish illegal voter intimidation and alleges nothing "more than labels and conclusions." *Twombly*, 550 U.S. at 555. **Paragraph 49** does not allege any illegal activity but instead establishes that Ms. Jennings was in fact urging drop box observers *not* to go within 75 feet of drop boxes.

**Paragraph 50** does not allege illegal voter intimidation but instead shows an anonymous photo of a voter. **Paragraph 51** is an irrelevant and inflammatory statement that former President Trump shared social media posts by Ms. Jennings. **Paragraph 52** does not allege any illegal activity by Defendants but instead attempts to link threats to a reporter to Defendants. **Paragraph 53** fails to allege illegal activity by Defendants. **Paragraph 54** fails to allege illegal activity by Defendants. **Paragraph 55** fails to allege illegal activity by Defendants, as the post Plaintiffs cite to for evidence does not in fact "confirm[] that the individuals who intimated the voter were volunteers" working with Defendants. **Paragraph 56** fails to allege illegal activity by Defendants, as it does not establish that Ms. Jennings or her organization encouraged anyone to intimidate voters. Moreover, the post Plaintiffs cite to for evidence merely shows a group who "says they're with Clean Elections USA, but wouldn't elaborate on if they're volunteers, or what." The post notes that the "group" is merely "watching a ballot drop box." **Paragraph 57** fails to establish any connection to or illegal activity by Ms. Jennings or her organization. **Paragraph 58** fails to establish any illegal activity. Instead, the social media post Plaintiffs cite to shows Ms. Jennings exercising her First Amendment right to express that "wearing tactical gear and carrying in our country" is an inalienable right. There is no allegation or evidence that Ms. Jennings urged anyone to open carry, which is nevertheless legal in Arizona. **Paragraph 59** does not establish any illegal activity by or a connection to Defendants.

**Paragraph 60** does not establish any illegal activity by or a connection to Defendants. **Paragraph 61** does not establish any illegal activity by or a connection to Defendants. **Paragraph 62** does not establish any illegal activity by or a connection to

Defendants. **Paragraph 63** does not establish any illegal activity by or a connection to Defendants. **Paragraph 64** does not establish any illegal activity by Defendants. **Paragraph 65** does not establish any illegal activity by Defendants. Instead, it shows Ms. Jennings exercising her First Amendment right to express her belief that observing drop boxes deters illegal voting. **Paragraphs 66** and **67** are inapplicable, as they do not establish any illegal activity by Defendants.

The evidence and testimony the League presented the hearings in this matter, because it is not incorporated into the complaint (which Plaintiffs have not subsequently sought to amend), should not be considered for the purpose of a motion to dismiss, which tests the sufficiency of the complaint itself. *Leal v. ALCOA*, 2006 U.S. Dist. LEXIS 70319, at *11 (D. Ariz. Sep. 21, 2006) (stating that "[r]eview under Rule 12(b)(6) generally is limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference…. [and] may not, for example, take into account additional facts asserted in a memorandum opposing the motion to dismiss") (citing *Taylor v. Vermont Dept. of Education*, 313 F.3d 768, 776 (2d Cir. 2002), *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)). Nonetheless, should the Court for some reason consider these items, such consideration would merely serve to highlight the futility of amendment.

Although this Consolidated Motion to Dismiss Plaintiffs' Complaints primarily focuses on the more extensive League Complaint, the Alliance Complaint fares no better because, even after considering all the evidence the Alliance presented at the October 26 hearing, the Court found that "the record shows that Defendants' objective is deterring supposed illegal voting and illegal ballot harvesting" (Dkt. No. 32 at 7) and that, "[o]n this record, Defendants have not made any statements threatening to commit actus of unlawful violence to a particular individual or group of individuals" (*id.* at 9). Additionally, the Court found "no evidence that that Defendants have publicly posted any voter's names, home addresses, occupations, or other personal information." (*Id.*) Instead, the Court found that "Jennings continuously states that her volunteers are to 'follow laws' and that

'[t]hose who choose to break the law will be seen as an infiltrator intent on causing [CEUSA] harm.'" (*Id.* (citations omitted)). In fact, "Jennings' social media posts also admonish volunteers to remain outside the statutorily prescribed seventy-five-foot voting location radius," and "the record contains evidence of Jennings' social media posts instructing her affiliates *not* to engage with or talk to individuals at the drop boxes." (*Id.* (citations omitted) (emphasis added)). Indeed, "a reasonable listener could not interpret Ms. Jennings' social media pronouncements that alleged 'mules' will 'shrink back into the darkness' following her drop box initiative as true threats." (*Id.*) Moreover, "Defendants' conduct does not fall into any traditionally recognized category of voter intimidation." (*Id.*)

Additionally, in testimony presented at the November 1 hearing, no witness testified that they had experienced intimidation by Ms. Jennings, her organization, or anyone affiliated with her organization; instead, witnesses testified that they felt intimated because of news media reports. (*See, e.g.*, Nov. 1, 2022, Hr'g Tr. at 33:2-8, 38:3-4, 44:19-5, 87:4-22, 104:19-21, 107:22-4, 108:12-15, 115:19-20, 118:11-13, 118:25-119:3, 122:13-20, 125:18-126:4, 134:4-8 & 18-21, 140:9-10, 141:14-142:1.) Further, much of this testimony specifically refers to news stories about drop box observers wearing tactical gear and open carrying firearms. But, as the League established in its complaint, it is the dismissed defendants who appear to be responsible for these tactics, rather than Ms. Jennings or her organization. As noted above, the League specifically described the dismissed defendants as "invoking the language of war" (League Compl. ¶ 39), for "publicly affirm[ing] that their drop box observers may be armed (*id.* ¶ 40), and for having "deep ties to extremist groups" and "endorsing political violence" (*id.* ¶ 41). Thus, it is more likely that the acts of intimidation reported to the Arizona Secretary of State were committed by others, including those who were dismissed from the League's lawsuit.

Notable as well is the fact that the witnesses claim to be intimated by being photographed while delivering their ballots, but Arizona law only prohibits photography within 75 feet of *a polling place* (not at drop boxes). A.R.S. § 16-515(G). The legislature

has declined to apply this prohibition to drop boxes, and this is perhaps why Arizona news media has numerously and repeatedly published photos of voters and their vehicles at ballot drop boxes.[4] If the Court can broadly restrict Defendants from participating in these First Amendment activities at the behest of Plaintiffs, then it must also restrict the media while also contending with Arizona election law. However, as the Court previously explained and as discussed later below, the Court cannot issue such a broad injunction without violating Defendants' First Amendment rights.

Moreover, although the League presented what appeared to be compelling testimony from Complainant 240, that testimony ultimately failed to establish any illegal activity by Ms. Jennings or her organization. Complainant 240 admitted that he had seen news media stories via Reddit[5] and Twitter about drop box observers prior to voting (Nov. 1, 2022, Hr'g Tr. at 87:4-11), that he was unaware of Ms. Jennings or her organization prior to voting (*id.* at 67:21-23), that he personally felt bullied due to observers approaching him and stating in a conversational tone that they were hunting for mules (*id.* at 89:6-10 & 15-20, 90:10-13), yet he approached the observers in a confrontational manner and made a crude gesture toward them (i.e., grabbling his crotch) (*id.* at 74:14-23). Further, while Complainant 240 testified that "the implied threat of filming" made him feel bullied (*id.* at 91:13-15), he also admitted that no one from the group threatened to publish photos or videos of him on the evening when he voted (*id.* at 91:16-18). In fact, it was the news media that released footage of him, which it apparently obtained from Maricopa County. (*Id.* at 79:1-7, 85:15-19, 86:5-6.) However, he also admitted that he

---

[4] *See, e.g.*, https://www.washingtonpost.com/politics/2022/10/20/arizona-ballot-drop-boxes/. *See also* https://www.thedailybeast.com/doj-alerted-to-creepy-surveillance-attempt-at-maricopa-county-arizona-dropbox, https://www.abc15.com/news/political/elections/intimidation-complaint-claims-voter-was-filmed-accused-ofbeing-mule-at-mesa-dropbox.

[5] Reddit is generally perceived as a left-leaning social media platform. *See, e.g.*, Steve Kuhn, *Why Is Reddit So Liberal?*, ITGEARED.COM (Oct. 14, 2022), https://www.itgeared.com/why-is-reddit-so-liberal/.

remains unidentified in the footage allegedly published by unknown persons possibly linked to Defendants. (*Id.* at 93:25-94:10.). Moreover, he could not identify anyone from Ms. Jennings' organization as being responsible for revealing his identity or doing anything illegal. (*Id.* at 92:1-24.)

Nevertheless, even if Complainant 240 were able to prove voter intimation by Ms. Jennings or her organization then, at most, *he* might have a cause of action against Defendants. But Plaintiffs have not plead that Complainant 240 is a member of the Alliance or the League, and any injury suffered by him cannot be claimed vicariously by Plaintiffs. *See Gen. Tel. Co. v. Eeoc*, 446 U.S. 318, 333 (1980) ("It…goes without saying that the courts can and should preclude double recovery[.]"). Just because an activity is alleged to have damaged a member of an organization (and again, there is no allegation or testimony that Complainant 240 a member of the Alliance) does not mean the organization itself has stated a claim for damages. For example, in *Associated Gen. Contractors v. Cal. State Council of Carpenters*, the U.S. Supreme Court found that "Even though coercion directed by defendants" at unionized contractors "may have been unlawful, it does not, of course, necessarily follow that still another party -- the Union -- is a person injured by reason of a violation[.]" 459 U.S. 519, 529 (1983). As the Court explained, damages claims that are "indirect," and which "may have been produced by independent factors" are "highly speculative." *Id*. at 542. For this reason, and because such claims create the "potential for duplicative recovery or complex apportionment of damages[,]" they are "insufficient as a matter of law." *Id*. at 912. Here, the damages the Alliance claims to have suffered as an organization are likewise indirect and, if they exist, cannot be disaggregated from independent factors such as the media coverage of the drop box observation issue. Thus, they are likewise insufficient as a matter of law.

In *Wohl*, Plaintiffs were able to avoid dismissal of their damages claims. But there, the National Coalition on Black Civic Participation was not the only plaintiff. Rather, there were voter co-plaintiffs who adequately plead an individual depravation of

constitutional rights, fairly traceable to Defendants' actions, thus entitling them on the face of the complaint to at least nominal damages. *See* 512 F. Supp. 3d 500, 515-16.

Finally, even if the Court could somehow infer that Ms. Jennings (via her organization or social media posts) acted unlawfully by directly causing voters to experience intimation, "any definition of intimidation must account for rights established in the Constitution." (Dkt. No. 32 at 6.) As the Court previously explained, Plaintiffs' primary aim, to end Defendants' drop box surveillance activities, requires a further free speech analysis. (*Id.*) Although not all of Defendants' challenged conduct involves traditional speech, as the Court noted, the Supreme Court instructs that the protections of the First Amendment do "not end at the spoken or written word." (*Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).)

Rather, constitutional protection also extends to expressive conduct. (*Id.* (citing *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006).) To merit First Amendment protection, conduct must be "inherently expressive." (*Id.* (quoting Rumsfeld, 547 U.S. at 66).) The critical question is whether a reasonable observer would interpret the conduct as conveying some sort of message. (*Id.* (quoting Rumsfeld, 547 U.S. at 66) ("A narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll."))

As the Court found, the evidence in the record shows that Defendants' objective is deterring supposed illegal voting and illegal ballot harvesting. (*Id.* at 7.) Ms. Jennings' social media posts demonstrate that she believes the presence of her volunteers alone would convey messages to these supposed "ballot mules." (*Id.* (citing Dkt. No. 2 at 7-8).) The message is that persons who attempt to break Arizona's anti-ballot harvesting law will be exposed. (*Id.*) Thus, the Court found that a reasonable observer could interpret the conduct as conveying some sort of message, regardless of whether the message has any objective merit. (*Id.*) Although the Court made different findings at the November 1

hearing (which again, were based on matters not contained within the four corners of the complaints), if such matters are to be considered at all, Defendants urge the Court to reexamine the testimony by the various witnesses to ascertain that Ms. Jennings and her organization never veered from this message nor encouraged followers to intimate or harass anyone. Instead, Defendants have steadfastly encouraged drop box observers to follow the law, not to engage others, and have maintained that anyone who fails to do so is disavowed by the organization, which the Court noted in its October 28 Order, as explained above.

The Court also explained that it is well-established that there is a "First Amendment right to film matters of public interest." (*Id.* (quoting *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).) The Supreme Court has recognized a right to gather news. (*Id.* (citing *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).) And the public has a First Amendment right to "receive information and ideas." (*Id.* (quoting *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576 (1980) (citation omitted)).) S*ee also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."). As the Court explained, this right to receive information exists **regardless of that information's social worth**. (Dkt. No. 32 at 8 (citing *Stanley v. Georgia*, 394 U.S 557, 564 (1969).)

Of course, Defendants' right to encourage others, through speech, to assemble and associate at drop boxes to express the message that illegal voting must be discouraged and to film others in public continues to be protected under the First Amendment, even more so now that the narrowly tailored TRO has expired and Plaintiffs wish to further restrict Defendants' rights even more broadly with a preliminary and permanent injunction. But the Constitution continues to protect this activity, even to protect anyone who films others in public. Indeed, as explained above, Arizona media has seized upon this opportunity and has undoubtedly filmed many more voters than anyone Plaintiffs have named in this lawsuit.

For all the reasons above, Plaintiffs have also failed to state a claim for relief regarding the Klan Act. For as the Court previously explained, "Unlike Section 11(b) of the Voting Rights Act, the Support or Advocacy clause of the Klan Act contains language requiring intent." (Dkt. No. 32 at 11.) "Plaintiffs must show proof that the purpose or intent of Defendants' conspiracy was to intimidate or threaten voters from engaging *in lawful activity* related to voting in federal elections. But Plaintiffs have not provided the Court with evidence that Defendants intend to prevent lawful voting." (*Id.* (emphasis added).) Instead, "Defendants stridently maintain that they seek to prevent what they perceive to be widespread illegal voting and ballot harvesting." (*Id.*) As with the evidence set forth by the Alliance, the evidence set forth by the League fails to establish any "serious question going to the merits of Plaintiffs' Klan Act claim." (*Id.*)

Thus, because both Plaintiffs' have failed to state a cause of action under either the VRA or the Klan Act, the Court should dismiss their consolidated suit under Rule 12(b)(6).

## II. Plaintiffs AARA and the League lack standing to bring this suit against Defendants.

The Court must also dismiss Plaintiffs' consolidated suit because they lack standing to maintain it. Article III of the Constitution provides that federal courts may only exercise judicial power in the context of "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). *See id.* at n.6 (noting that even a plaintiff who seeks to "represent a class must allege and show that they personally have been injured") (internal quotations omitted). Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish standing, a plaintiff seeking the jurisdiction of a federal court has the burden of clearly demonstrating that he has: "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518); accord *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

Here, the Plaintiffs have failed to show that they have standing to sue under the VRA or Klan Act because (1) Plaintiffs have not suffered any concrete injury; (2) to the extent they have, any injury Plaintiffs have suffered cannot be attributed to Ms. Jennings or Clean Elections USA; and (3) a favorable decision by this Court will not redress Plaintiffs' claimed injuries.

As discussed above, there are simply no well-plead allegations that Ms. Jennings and her organization, rather than the dismissed defendants or other unaffiliated drop box observers, are responsible for the Alliance or the League having to divert resources to educate voters on intimidation. Witness testimony, to the extent this Court considers it at all (it shouldn't) establishes that damages to the League and Alliance are not caused by Ms. Jennings or her organization but rather, perhaps, by Arizona news media sensationalizing the threat of ballot drop box observers and causing its members to experience fear of voting by drop box. Again, however, many witnesses testified that they became fearful after hearing about drop box observers in the news, particularly those that mentioned observers wearing tactical gear and open carrying firearms. (But again, there is no allegation that Ms. Jennings directed anyone to wear tactical gear or open carry.)

Moreover, any injury the Court may infer from Defendants' actions are necessarily injuries to the individuals who experienced actual intimidation. Yet only one witness could testify to such injury (though he could not link it to Defendants), but Complainant 240 is not a member of the Alliance or the League. Additionally, both Complaints fail to allege *any* direct injury to Plaintiffs *by Defendants*. Thus, even if the Court were to issue the relief Plaintiffs request, it will not prevent the media from publishing any future

incidents of drop box observation, nor will it prevent other observers from continuing to monitor drop boxes.

### III.     The claim for injunctive relief is now moot.

There is no motion for TRO or preliminary injunction currently pending. Rather, this Court's previous order resolved the prayers for both preliminary injunctive relief and a TRO. Indeed, this was at the specific request of Plaintiffs. (*See* Hr'g Tr. at 162:16-21 (court request for Plaintiffs' position),[6] Tr.178:10-14 (Plaintiffs' reply that preliminary injunction is preferred).[7] And the court did not indicate that it would convert the order into a preliminary injunction, quite the contrary. (*See id.* at 190:14-23.[8]) Thus, Plaintiffs' request for a preliminary injunction has already been adjudicated.

And any request for further injunctive relief is certainly moot. This Court ordered entry of a TRO to expire a few days after the election (Dkt. No. 51.) The election has now passed. The 9th Circuit has provided the applicable rule:

> Speculative injury does not constitute irreparable injury sufficient to warrant **granting a preliminary injunction**. *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984). A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff

---

[6] "THE COURT: Okay. Final question: If I -- if I grant the relief that you are seeking, and I would note in addition to entering the -- the proposed TRO, but also the three items that you're requesting that -- that defendants contest, is it sufficient for me to do that in a TRO, or would you like that reduced to a preliminary injunction for – for appeal purposes?"

[7] "MR. DANJUMA: Your Honor, thank you so much. And I know it's been a long day. Very brief. 30 seconds. First of all, what you asked, if we'd prefer a PI or a TRO, and we would prefer a preliminary injunction, but we will take anything that the Court provides to us."

[8] "[THE COURT]: I -- I want to state with the narrow -- the form of narrowly tailored injunction that I would find that the balance of equities and public interest does tip slightly in plaintiffs' favor. As I have mentioned, it is paramount that we balance the rights of --of defendants to engage in their constitutionally protected First Amendment activity with the interest of plaintiffs and voters in casting their vote in a manner that's free of intimidation and harassment. And I believe that the -- that the temporary restraining order achieves that purpose."

must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief. *L.A. Coliseum*, 634 F.2d at 1201.

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (italics in original; emphasis in bold added). As the election is now behind us, there can be no imminent threat of injury. Any allegation that Defendants will engage in drop box monitoring in the future at all, much less in an upcoming municipal election, which is far less likely to attract the time and attention of volunteer monitors than a general election, is entirely speculative. And were Defendants to conduct such monitoring, any allegations regarding what policies and procedures they might put in place, legally required or not, to mitigate the alleged harms would also be speculative.

*Nat'l Coal. on Black Civic Participation v. Wohl* is not to the contrary. Rather, that case involves a discussion of the standing analysis on a motion to dismiss. 512 F. Supp. 3d 500, 515-16 (S.D.N.Y. 2021) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-82). It relies on express reference to claims for money damages, not injunctive relief, to prevent mootness. *Id.* at 517. ("Because Plaintiffs bring causes of action for both injunctive relief and monetary damages, as long as Plaintiffs can properly recover monetary damages, this action is not moot."). But here, Plaintiffs cannot, as a matter of law, properly recover money damages for the reasons set forth above.

The Court's reasons for entering its TRO have already been stated in the record, and no written order is necessary. (*See* Nov. 1 Hr'g Tr. at 182:1-190:23; *see also* Dkt. No 51 at 1:15-16 ("For the reasons stated on the record, IT IS ORDERED...).)

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss the consolidated suit against them by Plaintiffs.

**RESPECTFULLY SUBMITTED** this 30th day of November 2022,

By: */s/ Veronica Lucero*

Alexander Kolodin
Veronica Lucero
**Davillier Law Group, LLC**
4105 N. 20th Street Ste. 110
Phoenix, AZ 85016

*Attorneys for Defendants Clean Elections USA
and Melody Jennings*

LRCiv 12.1 CERTIFICATION

Pursuant to LRCiv 12.1, I hereby certify that on November 30, 2022, prior to filing the foregoing Motion to Dismiss, I notified the opposing parties via written notice (email) of the issues asserted in the motion, and the parties stated that they opposed the motion. Thus, the parties were unable to agree that the pleadings were curable in any part by a permissible amendment offered by the pleading parties.

By: /s/ Veronica Lucero

CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2022, I electronically submitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

By: /s/ Veronica Lucero